GEORGE W. DRYSDALE AND JEANETTE DRYSDALE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67243. Filed May 22, 1959.

*Edward G. DeGree, Esq.*, for the petitioners.
*Robert B. Pierce, Esq.*, for the respondent.

BRUCE, *Judge:* This proceeding involves deficiencies in income tax for the calendar years 1954 and 1955 in the respective amounts of $11,163.14 and $11,879.13. The only issue is whether the sums of $16,500 and $18,000 paid by Briggs Manufacturing Company to the Detroit Trust Company, trustee, in 1954 and 1955, respectively, as compensation to the principal petitioner under an amended employment contract constituted taxable income in the years paid.

### FINDINGS OF FACT.

The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

At all times pertinent petitioners were husband and wife residing in Grosse Pointe, Michigan. They filed joint income tax returns for 1954 and 1955 with the district director of internal revenue at Detroit, Michigan. The returns were filed on the calendar year and cash basis.

George W. Drysdale (hereinafter referred to as petitioner) was born on June 21, 1894, and was 58 years old when he entered into the contract pursuant to which the questioned payments were made. Petitioner had been employed by the Briggs Manufacturing Company (hereinafter referred to as Briggs) at Detroit, Michigan, in its automobile body division as an engineer since approximately 1926. Petitioner became a vice president of Briggs in 1953 and was in charge of all manufacturing divisions of Briggs. He has owned no Briggs stock since about 1935. Briggs was engaged primarily in the manufacture of automobile bodies and plumbing wares.

On October 1, 1952, petitioner and Briggs executed an employment contract. The pertinent provisions of the contract follow:

1. First party [Briggs] hereby employs second party [petitioner] and second party hereby accepts employment as hereinafter described in Paragraphs 2 and 7 hereof, all on the terms and conditions hereinafter set forth.

2. Second party, subject to the provisions of Paragraph 4 and 7 hereof, shall serve first party in such * * * capacities as the Board of Directors of first party shall from time to time determine and shall at all times devote his entire business time and attention and exert his best efforts to maintain and promote the business of first party. While so employed second party shall be considered for the purposes of this agreement as engaged in "full time employment."

3. During the period of such full time employment second party shall be paid such compensation as the Board of Directors of first party shall from time to time fix, but not less than at the rate of $6,050.00 per month * * *

4. Either party shall have the option to terminate such full time employment at any time after one (1) full year of full time employment hereunder by written notice given at least six (6) months prior to the effective date of termination. * * * After any termination of full time employment as above provided, employment of second party shall continue hereunder as set forth in Paragraphs 5, 6 and 7 hereof.

5. In the event such full time employment of second party should terminate prior to his attaining the age of sixty-five (65) years for any reason other than the death of the second party, then second party shall while living but subject to the terms and provisions of Paragraphs 7, 10 and 11 hereof, thereafter be paid monthly an amount [not less than $1,500] * * *, such payments to start thirty (30) days after termination of such full time employment and to continue for ten (10) years thereafter * * *

    *       *       *       *       *       *       *

7. During such period as second party shall be entitled to any payments under the terms and provisions of Paragraphs 5 and 6 hereof, employment of second party shall be in an advisory and consulting capacity and second party shall, while living and to the extent physically and mentally capable, consult with first party and advise first party at such reasonable times as first party may request with respect to the business activities and problems of first party and shall not during such period accept any employment * * * [which] * * * might reasonably be expected to be adverse to or inconsistent with that of first party * * *

8. In the event of the death of second party at any time he shall be receiving payments under either Paragraph 5 or 6 hereof, then first party shall pay to

the person or persons designated in Paragraph 12 hereof the sum of $1,500.00 per month for the balance of the ten (10) years during which otherwise the payments under said Paragraphs would have continued.

\*       \*       \*       \*       \*       \*       \*

10. In the event second party breaches any of the conditions or agreements on his part to be performed, second party shall forfeit all rights to further compensation of any nature to which he may be entitled hereunder.

11. Neither second party nor any of the persons, except the executor, administrator or personal representative of second party, designated under Paragraph 12 hereof shall be entitled to alienate, commute, encumber, sell, transfer or otherwise dispose of his or their rights to receive the compensation payments provided for herein and such rights are expressly declared non-assignable and non-transferable. Any attempted assignment or transfer shall immediately terminate any further liability on the part of first party hereunder.

12. All contingent payments which fall due hereunder after the death of second party shall be paid to his executor, administrator or personal representative, or such other person or persons as shall, under the Last Will and Testament of the second party or otherwise, be entitled thereto.

13. This agreement shall be binding upon and enure to the benefit of the parties hereto, any successors to the business of first party and the heirs and personal representatives of second party, but neither this agreement nor any rights hereunder shall be assignable by second party.

In the fall of 1953 Briggs entered into negotiations with Chrysler Corporation for the sale of the major portion of its manufacturing facilities to Chrysler. As a result of the negotiations Briggs sold its entire automobile body division to Chrysler, the sale to be effective December 29, 1953. Arrangements were made between Chrysler and Briggs for certain of Briggs' employees, including petitioner, to be transferred to the employ of Chrysler.

The president of Briggs notified petitioner that Chrysler wanted his services as a full-time employee after the sale. Briggs no longer needed petitioner's services as a full-time employee because the portion of its facilities sold to Chrysler accounted for over 90 per cent of its gross sales, and its facilities remaining after the sale would require the continued employment of only about 5 per cent of its total employees.

Discussions and negotiations between petitioner and Briggs and their attorneys were conducted to modify petitioner's employment contract because of the pending sale. On December 28, 1953, Briggs, petitioner, and the Detroit Trust Company (hereinafter referred to as trustee) as trustee executed an agreement which amended and modified the original employment contract. The pertinent terms of this agreement follow:

Now, THEREFORE, in consideration of the performance of the mutual covenants herein contained, it is agreed that said employment contract dated as of October 1, 1952, be and the same is hereby amended and modified by adding thereto, after paragraph 13, the following:

14. In event first party disposes of its automobile body manufacturing business during the term of this agreement,

(a) second party's full time employment with first party shall thereupon terminate and second party shall be free to accept other full time employment, including full time employment with the purchaser of such business.

(b) first party agrees in lieu of all further payments provided for in said contract dated as of October 1, 1952 to pay thereafter to the Trustee for the use and benefit of the second party the sum of $90,000.00 payable in monthly installments of not less than $1,500.00 each month, payable on the first day of each month, commencing one month after the consummation of said first party's disposal of its automobile body manufacturing business to the purchaser and continuing until the full sum of $90,000.00 without interest, has been paid.

(c) second party agrees that the payments to be made by first party to the Trustee under the preceding paragraph in this modification of said employment contract shall be in complete compromise, settlement, accordance and satisfaction of first party's obligations under said agreement as of October 1, 1952 and of all other obligations of first party under said employment contract dated as of October 1, 1952; and that while Trustee shall be receiving the payments provided for herein, second party shall perform the advisory and consulting services for first party provided for in paragraph 7 of said agreement.

15. Trustee agrees to accept said payments in behalf of the second party and to invest and reinvest said sums in United States government bonds and to hold and pay said sum under the following terms and conditions:

(a) As and when second party attains the age of sixty-five (65) years or when he retires from regular employment requiring full time effort, whichever event first occurs, Trustee shall pay to him from the funds received by it, the sum of $1,500.00 per month until said fund is exhausted;

(b) In the event second party shall die before attaining the age of sixty-five (65) years or before receiving the full amount of the trust fund, then the Trustee shall pay the same to second party's wife, Jeannette A. Drysdale, in like installments as provided in paragraph (a) above, until the fund is exhausted; if Jeannette A. Drysdale shall die before said fund is exhausted, the remaining balance thereof shall be paid then in a lump sum to her estate;

(c) For its services, Trustee shall be paid a reasonable fee from the funds held in trust in accordance with its current schedule of fees charged for services in similar matters.

16. It is mutually agreed that said contract of October 1, 1952 as herein amended shall continue in full force and effect.

Immediately following the sale to Chrysler, petitioner became a Chrysler employee. He did the same type of work for Chrysler as he had done for Briggs, and worked for approximately the same salary.

Briggs' original thought, as expressed by its officers, was to enter into an amended employment contract with petitioner providing for monthly payments directly to petitioner. However, pursuant to the terms of its amended agreement with petitioner, Briggs was obligated to pay to a trustee instead of to petitioner directly the sum of $90,000 in monthly installments of not less than $1,500, payments to begin 1 month after the sale of the automobile division. Commencing February 11, 1954, and each month thereafter during 1954 and 1955,

Briggs sent a check to the trustee in the amount of $1,230. Briggs withheld $270 from each $1,500 payment and paid this amount to the district director of internal revenue. Briggs detached the paycheck stub from each check and sent it to petitioner.

During 1954 and 1955 petitioner assisted Briggs in an advisory capacity. He continued to work for Chrysler as a full-time employee until January 1, 1957, when he retired. Petitioner received none of the money held by the trustee until after he had retired from full-time employment at Chrysler.

During 1954 Briggs paid the trustee $16,500 less $2,970 withholding tax. During 1955 Briggs paid the trustee $18,000 less $3,240 withholding tax. Petitioner received W-2 forms reflecting the above facts and attached them to his 1954 and 1955 tax returns. Petitioner did not include the $16,500 and $18,000 in his gross income in 1954 and 1955, but in computing the balance due on his tax liability for each of these years he deducted the amounts withheld by Briggs. Briggs deducted the $16,500 and $18,000 in 1954 and 1955, respectively, as business expenses in computing its taxable income. Respondent determined that the $16,500 and $18,000 constituted taxable income to petitioner in 1954 and 1955, respectively.

### OPINION.

The only issue is whether the moneys paid for petitioner's benefit to a trustee by Briggs in 1954 and 1955 were income to petitioner in the years so paid. Respondent contends the amounts paid by Briggs to the trustee conferred an economic or financial benefit on petitioner in the years so paid and were income to petitioner in those years. He bases his contention on the concept of constructive receipt, as illustrated in *Loose* v. *United States*, (C.A. 8, 1934) 74 F. 2d 147, and on the cash equivalent doctrine, as exemplified by *E. T. Sproull*, 16 T.C. 244, affd. (C.A. 6, 1952) 194 F. 2d 541. In support of his position respondent argues that there were no limitations or restrictions on petitioner's right to receive the moneys in question; that the $16,500 and $18,000 were paid by Briggs for petitioner's benefit in 1954 and 1955, and petitioner had nothing further to do to establish his right to those moneys. He further argues that Briggs was willing to make the $1,500 payments directly to petitioner rather than to a trustee, and therefore, if any restrictions or limitations on petitioner's right to receive the payments existed, they were self-imposed.

Petitioner argues he had no control over the moneys in question and derived no economic benefit from them during the years in issue. He contends he had no right to and did not receive any of the moneys during the years in issue; that his right to receive the moneys was subject to the conditions and restrictions of the original employment

contract and was forfeitable if he failed to comply with the provisions of that contract.

For the reasons hereinafter discussed it is our opinion that the moneys paid to the trustee were income to petitioners during the years in issue.

The Internal Revenue Code of 1954 and the regulations thereunder have made no pertinent substantive changes in the constructive receipt and cash equivalent concepts of income inclusion as they were applied under earlier revenue acts and regulations. Sections 441 and 446, I.R.C. 1954, provide so far as here pertinent that an individual may report his taxable income on a calendar year basis and by the cash receipts and disbursements method. Section 451(a), entitled "General Rule For Taxable Year of Inclusion" provides:

(a) GENERAL RULE.—The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

In Income Tax Regulations, section 1.446–1(c)(1)(i), it is stated that, "[g]enerally, under the cash receipts and disbursements method in the computation of taxable income, all items which constitute gross income (whether in the form of cash, property, or services) are to be included for the taxable year in which actually or constructively received."

Income Tax Regulations, section 1.451–2, which is entitled "Constructive Receipt of Income," provides that "[i]ncome although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account or set apart for him so that he may draw upon it at any time. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions."

A classic example of the concept of constructive receipt is found in *Loose* v. *United States, supra*, wherein a deceased taxpayer had failed to clip and cash bond coupons maturing before his death. The coupons were cashed by the taxpayer's executrix. In holding on a theory of constructive receipt that the proceeds from the coupons were income to the deceased taxpayer prior to his death rather than an asset of his estate, the Court of Appeals observed that "for taxation purposes income is received or realized when it is made subject to the will and control of the taxpayer and can be, except for his own action or inaction, reduced to actual possession."

Whether an individual was in constructive receipt of income in a given year is essentially a fact question and a review of numerous cases involving this issue would be of little benefit. However, prior decisions, such as *Loose*, above, do tell us that the thrust of the doc-

trine of constructive receipt is that a cash basis taxpayer will be deemed to have realized income in the year in which it became subject to his unrestricted control, despite the fact that he did not receive the income in that year.

The amended employment contract providing that payments were to be made to a trustee instead of to the petitioner directly was executed before, not after, petitioner's right to receive the payments arose. Cf. *Lucas* v. *Earl*, 281 U.S. 111. In this sense this case is similar to *James F. Oates*, 18 T.C. 570, affd. (C.A. 7, 1953) 207 F. 2d 711, relied on by petitioner. The *Oates* case involved the deferment of income as the result of a mutually advantageous bona fide agreement reached through arm's-length bargaining between an insurance company and its agents as a group. It should be noted that the agreement had a legitimate business purpose aside from the fact that it enabled the agents to defer their reporting of income.

In the instant case, however, the only apparent purpose of Briggs' making the payments to a trustee instead of to petitioner directly was to reduce petitioner's tax burden. Briggs no longer needed petitioner's services as a full-time employee once the sale to Chrysler was consummated, but it did desire to retain petitioner in an advisory capacity. Briggs was willing to pay petitioner $90,000 at the rate of $1,500 per month for his advisory services, and as an officer of Briggs testified, "We were perfectly willing and ready to pay the money direct [to petitioner]." [1] However, petitioner had an annual salary of approximately $72,000 and it was highly advantageous to him to defer receiving and reporting the payments in question as income until after he retired from full-time employment. Thus the trust arrangement was created through the amended employment contract. The facts and circumstances surrounding the execution of the amended employment contract compel the conclusion that the payments to the trustee pursuant to the contract were compensation for the advisory services rendered by petitioner during the years in issue, and petitioner, apparently of his own volition and for no purpose other than to defer the reporting of income, effected a self-imposed limitation on his right to receive the payments direct. For this reason the instant case is distinguishable from *Oates*, *supra*, and falls squarely within the scope of *Williams* v. *United States*, (C.A. 5, 1955) 219 F. 2d 523.

In the *Williams* case, the taxpayer was willing to sell some timber to a certain prospective purchaser. The purchaser desired and was

---

[1] Briggs' president, who was a vice president and a director of Briggs in 1953, also testified as follows:

Q. Who suggested the intervention of the Detroit Trust Company as trustee?

\* \* \* \* \* \* \*

A. We certainly did not. Briggs Manufacturing Company did not suggest it. There would be no reason for us to make any such suggestion.

able to pay the full purchase price to the taxpayer immediately, but the taxpayer declined to consummate the sale without first arranging an irrevocable escrow agreement whereby he would receive the purchase price over a 5-year period. Pursuant to the agreement the purchaser received immediate rights to the timber and therefore nothing remained to be done to firm-up the taxpayer's right to receive the purchase price. The sole purpose for the escrow agreement was to save taxes by spreading the receipt of the money and the reporting of income over a 5-year period. The Court of Appeals held the entire purchase price to be income to the taxpayer in the year of the sale, observing that when the prospective purchaser desired and offered to pay the full purchase price, the taxpayer was in constructive receipt of the money, and the self-imposed limitation of the escrow agreement had no substantive effect upon the transaction.

As noted above, the sole purpose for the trust arrangement in the instant case, like the escrow agreement in *Williams*, was to reduce petitioner's tax burden. Furthermore, as in *Williams*, petitioner's right to receive the payments in question was nonforfeitable. We agree with petitioner that his right to receive the payments was subject to the provision for forfeiture contained in paragraph 10 of the original contract. Paragraph 10 provides that, "[i]n the event second party [petitioner] breaches any of the conditions or agreements on his part to be performed, second party shall forfeit all rights to *further* compensation of any nature to which he may be entitled hereunder." (Emphasis supplied.) There is no provision for payments once made to the trustee for petitioner's benefit to be returned to Briggs in the event of a breach on petitioner's part. It seems clear that had such a provision been desired it would have been inserted in the trust agreement.

In the final analysis petitioner rendered advisory services to Briggs during the years in issue and Briggs made payments to the trustee for petitioner's benefit. There is no contention that petitioner or Briggs failed to perform pursuant to the terms of the contract. Thus the employment contract was fully executed so far as the years in issue were concerned. Nothing remained to be done to firm-up petitioner's right to the moneys which were irrevocably placed in a trust for his exclusive benefit. The trust arrangement was nothing more than a deferment of receipt of compensation. Under the circumstances, the self-imposed trust arrangement is deemed to have no substantive effect. The Detroit Trust Company was simply petitioner's designated agent to receive the payments in his behalf, and the payments in question are held to be income to petitioner during the years in issue. *Williams* v. *United States*, *supra*.

Having held for respondent on the above theory, a discussion of his other arguments is deemed unnecessary. However, see and com-

pare *E. T. Sproull, supra,* which is similar to the instant case in many respects. It is also to be noted that neither party has offered any arguments concerning the possible application of section 402(b) of the Internal Revenue Code of 1954 with respect to the trust here involved, and, in view of our holding above, we deem it unnecessary to consider it.

Reviewed by the Court.

*Decision will be entered for the respondent.*

WITHEY, *J.,* concurring: I concur in the result reached by the majority for the reason, however, that the $1,500 monthly payments here involved were paid currently as services were rendered by the taxpayer for his sole benefit and at his specific request. They are as nearly a direct payment for services rendered by him as possible without the actual physical placement of the $1,500 payments in his own hands. *Lucas* v. *Earl,* 281 U.S. 111.

TURNER and MULRONEY, *JJ.,* agree with this concurring opinion.