MORRIS ZELTZERMAN AND PEARLE C. ZELTZERMAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 71407. Filed April 18, 1960.

*I. Frederick Shotkin, Esq.*, for the petitioners.
*Manning K. Leiter, Esq.*, for the respondent.

ATKINS, *Judge:* Respondent determined deficiencies in income tax of petitioners for the years 1954, 1955, and 1956 in the respective amounts of $2,688.70, $4,583.80, and $5,455.05.

The only issue presented is whether there should be included in the income of the petitioner Morris Zeltzerman the amounts used by the Morrison and the Lancaster Hospitals in acquiring annuity contracts for the petitioner or on account of the receipt by the petitioner of rights in such annuities.

FINDINGS OF FACT.

Some of the facts were stipulated, the stipulations being incorporated herein by this reference.

The petitioners are husband and wife residing in Berlin, New Hampshire. They filed joint income tax returns for the calendar years 1954, 1955, and 1956 with the district director of internal revenue at Portsmouth, New Hampshire. Petitioners reported their income on the cash receipts and disbursements method for all the years in question. Since Pearle C. Zeltzerman is a party to these proceedings only because she and her husband filed joint returns for the years in question, Morris Zeltzerman will hereinafter be referred to as petitioner.

Petitioner is a physician specializing in radiology, having been certified as a radiologist by the American Board of Radiology. Since 1946 or 1948, and continuing through the years in question, 1954, 1955, and 1956, he performed services as a radiologist for the Morrison Hospital in Whitefield, New Hampshire, and the Beatrice Weeks Memorial Hospital in Lancaster, New Hampshire, the last named being hereinafter referred to as the Lancaster Hospital. Both of these hospitals are organizations of the character described in section 501(c)(3) of the Internal Revenue Code of 1954 and are exempt from taxation under section 501(a). The petitioner was also engaged in these years in rendering similar services to the St. Louis Hospital in Berlin, New Hampshire, receiving cash compensation from that hospital, which is not in controversy herein, in the approximate amounts of $27,000 in 1954, $28,000 in 1955, and $35,000 in 1956.

The petitioner's services were rendered to the Morrison and the Lancaster Hospitals under oral agreements. He worked at the St. Louis Hospital every morning. He worked on Tuesday and Friday at the Lancaster Hospital and on Thursday at the Morrison Hospital, in each instance being required to be at the hospitals at about 1 or 1:30 in the afternoon. Each hospital scheduled the patients which he would see, and he was free to leave after he had performed all necessary work. However, he was on call at all times for emergencies. Under the arrangements with the Lancaster and the Morrison Hospitals the petitioner did not have the right to change or modify the schedules set up by the hospitals, but if he gave sufficient advance notice, the hospitals would hold patients until he could arrive or would schedule his work for another day of the week. His work was performed primarily at the hospitals, which had X-ray machines and other necessary equipment. The petitioner did not own an X-ray machine. All supplies used by petitioner were furnished by the hospitals. Each hospital also employed an X-ray technician who assisted petitioner and took routine X-rays. The petitioner was not consulted about hiring or discharging these technicians. The petitioner's work consisted of taking the more complicated X-ray pictures, conducting barium and fluoroscopic examinations, and reading X-rays from which he gave diagnoses to the physicians of the patients who were X-rayed. No one directed the petitioner as to the manner of the performance of his technical duties. All work performed for the hospitals involved patients of other doctors. The patients were scheduled by the hospitals and billed by them according to a schedule of fees determined by the hospitals.

Some of the petitioner's work for the hospitals was done at his home where he had a room set aside for examining X-ray films. Messages and films were received at his home by a domestic servant. The petitioner's arrangements with the hospitals did not provide for any paid vacations. Every third weekend for 9 or 10 months of the year he took 4-day trips to attend seminars in various towns. He did not furnish a substitute radiologist to perform services at the various hospitals on these occasions, but made up his work after he returned. These trips were the only vacations he took. In 1956 the petitioner was away from his work at the hospitals for an extended period due to illness and to attend a convention, on which occasions he provided substitute radiologists for the hospitals. This did not affect the petitioner's financial arrangements with the hospitals. He paid the radiologists a flat sum for substituting for him.

During the years in question the petitioner did not practice his profession other than as described above. He did not list himself as a physician or radiologist in the telephone directory nor did he display a physician's sign.

Throughout the years immediately prior to 1954 and continuing through the years in question the petitioner, pursuant to oral contracts, was entitled to compensation from the Lancaster and the Morrison Hospitals based upon a percentage of all X-ray charges made by the hospitals, whether or not collected by the hospitals, being 40 per cent of such charges in the case of the Lancaster Hospital and 39 per cent in the case of the Morrison Hospital. Prior to June 1954 he received his compensation from each of these hospitals by monthly check based upon these percentages of charges by the X-ray departments. The petitioner did not submit any bills of his own and did not receive any payments directly from the Blue Shield Division of the New Hampshire-Vermont Service. The hospitals were compensated by the Blue Cross in those instances where patients were members. The Lancaster Hospital maintained a record of all cash disbursements. In connection therewith it kept a payroll account which consisted of disbursements only to employees from whom taxes were withheld. The petitioner was not listed in the payroll account, the only physician therein being a pathologist who worked on a flat salary in 1956.

In May 1954 the petitioner received a letter from Edward M. Fels, a certified public accountant in New York City, stating in part as follows:

While doing tax research I came across a plan of compensation that would be very advantageous for some one in your position.

It would enable you to put aside certain sums in annuities, such sums not being taxable until your eventual retirement and the collection of such annuities. This would be especially advantageous to you since you are not covered by "Social Security". * * *

The letter then quoted a tax service discussion of the taxability, under section 22(b)(2)(B) of the Internal Revenue Code of 1939, of annuities purchased by employers exempt under section 101(6) of the Internal Revenue Code of 1939 for professional employees, and concluded with an offer to furnish further information if requested. The petitioner paid Fels $200 for the information received in the letter, and did not request further information. Fels was not the petitioner's accountant during the period 1954 through 1956.

After receiving the above letter the petitioner, about June 1954, discussed it with Margerite Monahan, administrator of the Lancaster Hospital. He told her that he thought that this "condition that exists" applied to him and proposed that annuities be acquired for him. At that time he also spoke to the president of the board of trustees of the hospital with respect to the proposal. Margerite Monahan then referred petitioner's request to the board of trustees of the Lancaster Hospital. The petitioner also had a similar discussion with Maryon LaDuke, superintendent of the Morrison Hospital,

and she referred the proposal to the board of trustees of the Morrison Hospital. Meetings of the boards of trustees of the hospitals were held in June 1954 at which the petitioner's proposal concerning the purchase of annuities and Fels' letter were discussed. Petitioner's proposal was not presented in writing at either meeting and the petitioner himself was not present. Each board acted favorably upon the petitioner's proposal. No written agreement was executed with the petitioner concerning the purchase of annuities. Minutes of each of these meetings were kept, but were not presented in evidence.

On September 13, 1954, the petitioner wrote the district director of internal revenue at Portsmouth, New Hampshire, concerning the effect which the Internal Revenue Code of 1954 might have on the situation outlined in Fels' letter. On September 17, 1954, the district director replied to the petitioner's letter informing him that the provisions of the Internal Revenue Code of 1939 had not been materially changed by the Internal Revenue Code of 1954. The district director did not purport to rule upon the tax effects of the transaction, but advised the petitioner of the procedure to obtain a determination letter or ruling. The petitioner did not pursue the matter or obtain a ruling.

After the meetings of the boards of trustees of the two hospitals petitioner received from them no payments of compensation by check or cash during the remainder of 1954. For convenience, Raymond W. McCaig, who was treasurer of the Lancaster Hospital and also treasurer of a local bank, opened a savings account in the bank in the name of "Lancaster Hospital Association—In Trust for Dr. Morris Zeltzerman." Monthly checks representing the petitioner's 40 per cent of X-ray charges were deposited in this account. The account was solely within the control of the hospital and petitioner was unaware of its existence until the latter part of 1956.

On December 23, 1954, the Lancaster Hospital withdrew from the above savings account an amount of $3,800, which was all but $6 of the amounts deposited in the account from July 17 up to that time, and paid this amount to the New York Life Insurance Company for an annuity contract dated December 30, 1954. On December 24, 1954, the Morrison Hospital paid the New York Life Insurance Company an amount of $1,697.44 for an annuity contract which was dated January 6, 1955. This amount of $1,697.44 represented the amount calculated over the period from June to the end of the year in accordance with the above-described salary arrangement formula. Each of these contracts named the petitioner as the annuitant and the hospital as the owner. Each contained an endorsement naming as beneficiary the petitioner's wife or, in the event of her death, the child or children of the annuitant. Each provided for the payment

of specified monthly annuity payments commencing on the policy anniversary date nearest to the annuitant's 65th birthday. Each provided, among other things, that the monthly annuity should be paid to the owner of the policy so long as the annuitant was alive; that the owner could change the beneficiary while the annuitant continued to be alive; that the owner could transfer ownership of the contract; that dividends when payable should be applied as elected by the owner; and that the owner could surrender the policy at any time before the annuity commencement date and receive its cash value. Each provided, however, that if the annuitant should die before the annuity commencement date the company would pay to the beneficiary a sum equal to the premiums which had been paid.

On December 15, 1955, the Lancaster Hospital withdrew from the savings account an amount of $7,800 which it paid to the Travelers Insurance Company for a single-premium annuity contract dated December 15, 1955, in which the petitioner was designated as the annuitant. On the same date the Morrison Hospital also purchased from the Travelers Insurance Company a single-premium annuity contract bearing the same date, naming the petitioner as the annuitant, paying therefor the sum of $2,603.08, this being the amount computed on the basis of the compensation formula for services performed by the petitioner during the year 1955.

During 1956 the Lancaster Hospital continued to deposit checks in the savings account, based upon petitioner's percentage of X-ray charges. The balance in such account on December 28, 1956, was $8,795.63, of which $8,794.37 was withdrawn by the hospital on that date. The petitioner had decided that he could not afford to have his entire earnings from the hospitals during that year invested in annuities. Pursuant to an oral understanding which had been arrived at between the Lancaster Hospital and the petitioner at about the beginning of 1956, $2,000 of the balance in the savings account as of December 28, 1956, was paid to the petitioner at the end of 1956 by check of the hospital issued by its payroll section. The Lancaster Hospital paid $6,675 of the withdrawal to the Travelers Insurance Company for a single-premium annuity contract with the petitioner designated as the annuitant. The remainder of the withdrawal, $119.37, was paid to petitioner by check. This represented interest accrued on the savings account during 1956. The petitioner included this in his reported income, but in January 1957 paid this amount (by check for $120) to the Lancaster Hospital Building Fund.

In 1956 the amount computed upon the basis of the compensation formula arrangement between the petitioner and the Morrison Hospital amounted to $2,404.74. The Morrison Hospital paid the Travelers Insurance Company $1,404.74 for a single-premium annuity

contract, dated December 15, 1956, naming the petitioner as the annuitant. At about the same time the Morrison Hospital paid $1,000 directly to the petitioner.[1]

Each of the above annuity contracts issued by the Travelers Insurance Company contained provisions similar to those of the New York Life Insurance Company annuity contracts described above, with the exception that the Travelers Insurance Company agreed to pay the monthly annuities to the named annuitant, the petitioner, rather than to the hospital, and with the further exception that there was no provision for surrendering the contract and receiving its cash value. All the annuity contracts were delivered into the petitioner's possession at the time of issuance. Despite the provisions in the various annuity contracts which might indicate the contrary, it was the petitioner's understanding with the hospitals that the annuity payments would be made to him unconditionally at the times provided in the annuity contracts, that payments to him under the annuities were not contingent upon his continuing to work for the hospitals until he reached the age of 65, and that if he should leave the hospitals he would still be entitled to the payments under the annuity contracts.

The stipulated amounts received by the petitioner in cash from the Lancaster Hospital and the stipulated amounts applied toward the purchase of annuities in the taxable years were as follows:

| Taxable year | Received in cash | Applied toward purchase of annuities |
|---|---|---|
| 1954 | $3,692.68 | $3,800 |
| 1955 | 136.90 | 7,800 |
| 1956 | 2,119.37 | 6,675 |

The stipulated amounts received by the petitioner in cash from the Morrison Hospital and the stipulated amounts applied toward the purchase of annuities in the taxable years were as follows:

| Taxable year | Received in cash | Applied toward purchase of annuities |
|---|---|---|
| 1954 | $1,193.94 | $1,697.44 |
| 1955 |  | 2,603.08 |
| 1956 | 1,000.00 | 1,404.74 |

Neither hospital withheld taxes with respect to the petitioner's compensation in any of the years in question, except for an amount

---

[1] The petitioner and the chairman of the board of trustees of the Morrison Hospital had executed a document dated December 1, 1955, providing as follows:

"To Whom It May Concern:

Dr. Morris Zeltzerman is to be employed by the Morrison Hospital of Whitefield, N. H. for the rendering of radiological services at the rate of one thousand dollars ($1,000.00) for the year of December 1, 1955 to Dec. 1, 1956, to be paid in December of 1956."

of $40 withheld by the Lancaster Hospital in 1956 as social security taxes on an amount of $2,000 shown on a withholding tax statement as total wages paid. The Morrison Hospital executed a withholding tax statement for 1956 showing wages paid to petitioner of $1,000, but did not withhold any amount of income or social security tax.

In his income tax returns for the years 1950 through 1954 the petitioner stated that he was self-employed. In his return for the year 1955 he left blank the space provided for stating the name of the employer. In his return for 1956 the petitioner listed as his employers the Lancaster, Morrison, St. Louis, and Coos County Hospitals. In the joint returns for the years 1954, 1955, and 1956, which were prepared by the petitioner without any professional assistance, the petitioner itemized in Schedule C substantial amounts as business expenses incurred in connection with his work, including telephone and secretarial service (service of a domestic servant in answering the phone and receiving X-ray films) at his home. The profit shown on Schedule C was entered in each return as profit from business. In the joint returns for the years 1954, 1955, and 1956 petitioners did not include as income any amount on account of the above-described annuities or the amounts expended therefor.

The respondent, in the notice of deficiency, increased the petitioner's income in the amounts expended for annuities as follows: $5,497.44 for 1954, $10,403.08 for 1955, and $8,079.74 for 1956, stating:

upon your request and based on a fee basis for services rendered, you received, in addition to cash, income amounts representing annuity investments. * * *
*    *    *    *    *    *    *
the major item is that the purchase of annuities by the hospitals was not reported as income. Since the amounts received in the form of annuities are for professional services rendered, they are taxable in the year received under Section 61(a) of the Internal Revenue Code of 1954.

OPINION.

The petitioner was on the cash receipts and disbursements method of accounting and reporting his income. He did not directly receive any of the amounts of money which were paid by the two hospitals in the acquisition of the annuity contracts in question, and he contends that he did not constructively receive them. He, therefore, contends that he is not taxable upon such amounts. He also takes the position that, apart from certain cash payments, the only thing he received from the hospitals in the years in question as a result of the purchase of the annuity contracts was an unsecured and unfunded promise of the hospitals to pay certain monthly amounts to him upon his attaining the age of 65, arguing that the hospitals were the owners of the annuity contracts purchased. He further contends, however, that even if it be considered that he obtained

some interest in the annuity contracts, the purchase thereof would not result in taxable income to him in the years purchased since he was an employee of the hospitals and therefore is entitled to the benefit of section 403(a) of the Internal Revenue Code of 1954.[2] He argues that section 1.403(a)–1 of the Income Tax Regulations[3] is invalid as exceeding the scope of the statute.

The respondent contends that the amounts expended by the hospitals for annuity contracts constituted earnings of the petitioner which he had constructively received, they having been available to him in cash without substantial limitation or restriction, and that the hospitals were merely acting at the direction of the petitioner in purchasing such annuities. He denies that the petitioner was an employee within the meaning of section 403, but contends that in any event the cost of the contracts was contributed by the petitioner and not by the hospitals and that therefore section 403(a)(1) would have no application since it deals only with costs incurred by *employers* in the purchase of annuities.

Section 403(a) contemplates an employer-employee relationship, and much of the evidence and considerable portions of the briefs are devoted to the question of whether the petitioner was an employee

---

[2] Section 403(a), as it existed prior to amendment by the Technical Amendments Act of 1958, provides as follows:

* * * Except as provided in paragraph (2), if an annuity contract is purchased by an employer for an employee under a plan with respect to which the employer's contribution is deductible under section 404(a)(2), or if an annuity contract is purchased for an employee by an employer described in section 501(c)(3) which is exempt from tax under section 501(a), the employee shall include in his gross income the amounts received under such contract for the year received as provided in section 72 (relating to annuities) except that section 72(e)(3) shall not apply.

[3] Sec. 1.403(a)–1, Income Tax Regs., provides in part as follows:

* * * (a) An employee or retired or former employee for whom an annuity contract is purchased by his employer is not required to include in his gross income the amount paid for the contract at the time such amount is paid, whether or not his rights to the contract are forfeitable, if—

* * * * * * *

(3) The annuity contract is purchased by an employer which is an organization described in section 501(c)(3) and exempt under section 501(a) provided the purchase of the annuity is merely a supplement to past or current compensation. For the purpose of this subparagraph, whether the purchase of an annuity contract is merely a "supplement to past or current compensation" is to be determined by all the surrounding facts and circumstances. One of the pertinent facts to be taken into consideration is the ratio of the consideration paid by the employer for an employee's contract to the amount of his past or current compensation. For example, if the annual premium paid for an employee's contract is $1,000 and his annual salary is $10,000, the ratio indicates that the premium paid for the contract is merely a supplement to the employee's current compensation. If, however, an employee receives no current compensation, or the annual premiums paid for his annuity contract approximate his annual salary, the amount paid for his contract will be considered to be current compensation and taxable to the employee in the year in which it is paid by the employer. Other pertinent considerations are whether the annuity contract is purchased as a result of an agreement for a reduction of the employee's annual salary, or whether it is purchased at his request in lieu of an increase in current compensation to which he otherwise might be entitled. In such cases, the amount paid for the contract shall also be considered to be current compensation.

of each hospital. The answer to that question depends upon a consideration of all the facts and circumstances and is not free from doubt. Cf. *Wendell E. James*, 25 T.C. 1296. We find it unnecessary to decide that question, since even if we assume, *arguendo*, that the petitioner was an employee our conclusions on other aspects of the case preclude a holding in his favor.

Section 403(a) of the Internal Revenue Code of 1954 is, in the main, a reenactment of section 22(b)(2)(B) of the Internal Revenue Code of 1939. The latter was enacted by section 162 of the Revenue Act of 1942, which also amended section 165 and section 23(p) of the 1939 Code. The congressional committee reports dealing with the enactment of section 162 of the Revenue Act of 1942 clearly disclose that the purpose of enacting section 22(b)(2)(B) was to provide that where employers purchase annuity contracts for employees, the employees are to be taxed in the same manner that they would be taxed under pension plans, the only distinction between purchases by exempt employers and purchases by other employers being that in the case of the exempt employer the annuity plan need not meet the requirements of a qualified plan under section 165.[4] We think it obvious that in legislating with respect to annuity contracts purchased by exempt employers, Congress had in mind the usual type of annuity purchased by an employer out of its funds or by use of its funds and also contributions by employees. Of course, any contributions made by the employee would first have constituted taxable income to the employee. See *Cecil W. Taylor*, 2 T.C. 267, affd. *Miller* v. *Commissioner*, 144 F. 2d 287 (C.A. 4), and *Isaiah Megibow*, 21 T.C. 197, affd. 218 F. 2d 687 (C.A. 3). It certainly was not intended that current compensation of an employee which was available to him without substantial limitation or restriction, could be used by the employer, with the consent of, or at the

---

[4] In H. Rept. No. 2333, 77th Cong, 2d Sess., p. 106, 1942–2 C.B. 372, 452, it is stated:

In order to treat amounts received by employees under annuity contracts in the same way as amounts received under pension trusts as provided in section 165, as amended by this section, section 22(b)(2) is amended so that an employee who is a beneficiary of an annuity contract purchased by the employer in whole or in part will not be taxable upon the annuity contract until he receives payments under such contract or such payments are made available to him, if the annuity contract is purchased under a plan which would meet the requirements of section 165(a), with respect to pension trusts if the trust device had been used instead of the employer purchasing the annuity contract. * * *

In S. Rept. No. 1631, 77th Cong., 2d Sess., p. 141, 1942–2 C.B. 504, 609, it is stated:

Your committee has not changed the provisions of section 144(c) of the House bill, relating to employees' annuities, except in two respects. If an annuity contract is purchased for an employee by a religious, educational, or charitable organization, which is exempt under section 101(6), the employee will not be required to include in his income the amount paid by his employer for such annuity contract until he actually receives or there is made available to him the amounts required to be paid under the annuity contract, regardless of whether the annuity plan meets the requirements of section 165(a)(3), (4), (5), and (6) and whether the employee's rights are nonforfeitable. * * *

direction of, the employee, to purchase an annuity for him and thereby accomplish deferment of tax on such compensation.[5]

The petitioner in effect contends that the amounts used by the hospitals in purchasing the annuities were contributions by them as distinguished from contributions by him. This is based upon his contention that the action of the boards of trustees in June 1954 constituted a modification of his prior oral compensation agreements, that thereafter the hospitals were required to purchase the annuity contracts as of the end of each year, and that he had no right to withdraw any amount of current compensation in cash. The respondent disputes this, contending that there were no binding agreements modifying the prior oral contracts, that in the years in question the petitioner had the right either to take cash as theretofore or to have his compensation used by the hospitals to purchase annuity contracts for him.

For some years prior to the years in question the petitioner, pursuant to oral contracts, had received compensation by monthly checks from the two hospitals, based upon 40 per cent of all X-ray charges made by the Lancaster Hospital and 39 per cent of such charges made by the Morrison Hospital. No written agreements were entered into between the petitioner and the two hospitals in June 1954, and, although minutes were kept of the meetings of the boards, such minutes were not presented in evidence. The petitioner did not present a written proposal to the trustees, nor did he appear before them at the meetings. He merely dealt with the administrator and the superintendent of the respective hospitals, and requested that they present to the boards of trustees a request to buy annuity contracts for him, based upon a letter received by him from an accountant discussing the deferral of tax on income by the use of annuities.

At the hearing the petitioner testified in effect that it was his understanding that the hospitals would continue to compute his compensation by the existing formulas, but that after June 1954, he was not to receive cash, but was to receive at each yearend annuities purchased with the amounts calculated in accordance with the

---

[5] Sec. 23 of the Technical Amendments Act of 1958 amended section 403 of the Internal Revenue Code of 1954 to provide that amounts contributed by a tax-exempt employer in the purchase of an annuity contract for an employee should be excluded from the gross income of the employee to the extent not in excess of an exclusion allowance. The petitioner on brief has called attention to section 24 of the Senate Finance Committee Report on H.R. 8381, S. Rept. No. 1983, 85th Cong., 2d Sess., p. 36, 1958–3 C.B. 956, which contains a discussion of the changes made with respect to the taxability of the employee for whom a tax-exempt organization purchases an annuity. We find nothing therein which is in any way contrary to our conclusion above with respect to the taxability to the employee of current compensation available to him without substantial limitation or restriction. Indeed, in such committee report it is specifically pointed out that any amount already earned by an employee would be considered as constructively received and that converting it into an annuity could not serve to postpone tax thereon.

84

formulas. He stated that he did not tell the boards of trustees that at the end of each year he would tell them how much to use to purchase annuities. He further testified that later it became apparent to him that he could not afford to have all of his compensation paid by annuities and that thereafter he entered into further agreements with the hospitals in early 1956 or late 1955, providing that the Lancaster Hospital would pay him $2,000 of his compensation in cash for 1956, and that the Morrison Hospital would pay him $1,000 of his compensation in cash for that year.

Maryon LaDuke, superintendent of the Morrison Hospital, and Margerite Monahan, administrator of the Lancaster Hospital, presented the petitioner's requests in June 1954, to their respective boards of trustees and attended the meetings of the boards. However, according to their testimony, they did not remember much of the details of the petitioner's proposal or of the action taken by the boards. Margerite Monahan at first stated that she did not know what amount was to be paid in cash and what amount was to be paid in annuities. However she later testified that the entire amount of earnings was to be used for annuities. Maryon LaDuke testified that the board stated that the petitioner was to be paid annually, but that she did not recollect that the board stated how much of his annual payment would be in annuity and how much would be in cash.

Raymond W. McCaig, who was treasurer of the Lancaster Hospital and a member of the board of trustees, had set up, as a convenience to the hospital, a savings account in which there was deposited each month the compensation of the petitioner computed under the formula, and at each yearend the full amount or substantially the full amount in such account was withdrawn for the purpose of purchasing annuities. McCaig testified that the proposal presented by the petitioner to the board of trustees was that his salary be withheld and that at the end of the year it would be put into annuities or otherwise paid to him, whichever the petitioner decided, depending upon his particular situation at the time. At another point he stated that it was his understanding that petitioner had a right to do with the money as he saw fit. We are satisfied from McCaig's testimony that this was his understanding of the arrangement and that his understanding reflected the understanding of the hospital. This conclusion is fortified by the fact that the hospital treated interest on the bank account as belonging to petitioner.

After carefully considering all the evidence presented with respect to the arrangements or agreements between the petitioner and the hospitals existing after June 1954, it is our conclusion that there were no agreements having the effect of modifying or supplanting the existing oral arrangements under which the petitioner was entitled

to receive currently cash compensation for his services computed in accordance with the formulas. At least, the petitioner, upon whom rests the burden of proof, has not shown that there were. We think it is of some significance that sometime after June 1954 and after the passage of the Internal Revenue Code of 1954, the petitioner requested information from the district director as to the effect that such Code might have upon the purchase of annuities and that the petitioner's explanation, at the hearing, of his request was that he did not want to go ahead with the plan of buying annuities until he obtained the district director's opinion. This tends to indicate that the petitioner considered that he continued to have the right to decide whether he would draw his compensation in cash or have the hospitals purchase annuities. With respect to the change in the arrangements whereby petitioner received in 1956 from the Lancaster and the Morrison Hospitals, respectively, $2,000 and $1,000 of his compensation in cash, we think this is merely evidence of the fact that the hospitals were acquiescent to the desires of the petitioner.

It has been held that income that is subject to a person's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not. *Corliss* v. *Bowers*, 281 U.S. 376. See also *Richard R. Deupree*, 1 T.C. 113, *George W. Drysdale*, 32 T.C. 378, on appeal (C.A. 6), and *Williams* v. *United States*, 219 F. 2d 523 (C.A. 5). As indicated above, we think that there was no limitation or restriction upon the petitioner's right to draw down his current compensation in the years in question. He constructively received the compensation and is taxable thereon. In substance the hospitals were acting at his direction in purchasing the annuity contracts with his current compensation. The effect was the same as if the petitioner had drawn down the cash and purchased the annuities himself.[6] Under these

---

[6] The petitioner has argued at some length on brief that the hospitals were the owners of the annuity contracts in question, that all he received was the unsecured and unfunded promises of the hospitals to pay certain monthly payments to him upon his attaining the age of 65, and that hence he received nothing, aside from certain cash, which could be subject to taxation to him in the years in question. Since we have held that the petitioner constructively received the current compensation with which the annuities were purchased, we' think it is immaterial what disposition he made of such compensation or what type of annuity was purchased therewith. See *Richard R. Deupree*, 1 T.C. 113. However, if the hospitals were indeed the owners of the annuity contracts, that fact might give rise to the inference that it was the intention of the parties that the petitioner should not have unlimited control over the current compensation used to purchase the annuities. Suffice it to say that the petitioner was given possession of the annuity contracts and that the petitioner's own testimony establishes that as between him and the hospitals it was understood that he was in reality the owner, even though the hospitals were nominally such. He testified that he had no agreement with the hospitals as to the type of annuities to be purchased, that it was his understanding with the hospitals that the purchase of annuities satisfied their obligation to him, that his receipt of the annuity payments was not dependent upon his continued employment with the hospitals until he reached the age of 65, and that he could have left the hospitals and still would have been entitled to the benefits under the annuity contracts.

circumstances it cannot be considered that the hospitals were the purchasers of the annuity contracts within the meaning of section 403(a).

The petitioner cites *Commissioner* v. *Oates*, 207 F. 2d 711 (C.A. 7), affirming 18 T.C. 570, as being directly in point here. That case is distinguishable from the instant case. There it was clearly established that, pursuant to a right which he and all other general agents of the particular insurance company had, the taxpayer at retirement entered into a legal, binding, and irrevocable amended agency agreement with the insurance company, which provided that certain renewal commissions, which were not then due and payable, should be paid to him in specified equal amounts over a definite period, irrespective of when and in what amounts the commissions would otherwise become due and payable to him under his old contract. The court there pointed out that the new contract was in the nature of a novation or substitution of a new agreement or obligation for an old one, which was thereby extinguished, that consequently the rights of the parties were to be determined by the new contract, and that under the new contract the taxpayer had no right to demand or receive anything in addition to what he had agreed to accept, namely, $1,000 per month. The case of *Howard Veit*, 8 T.C. 809, also cited by the petitioner, is similarly distinguishable.

It may be added that we do not imply that, had the arrangements between the petitioner and the hospitals constituted binding restrictions upon his right to draw down his current compensation, they would have been effective to defer tax thereon under the circumstances of this case. In the view we have taken it is unnecessary to decide that question or to pass upon the petitioner's contention that section 1.403(a)–1 of the Income Tax Regulations is invalid.

We think the respondent did not err in his determination.

*Decision will be entered for the respondent.*