**Marvin H. and Kathleen G. TEGET, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. Civ 73–4082.**

United States District Court, D. South Dakota, S. D.

Feb. 12, 1976.

James T. Goetz, Yankton, S. D., and Walter R. Brown and W. Kendall Brown of Swift, Brown & Winick, Des Moines, Iowa, for plaintiffs.

William F. Clayton, U. S. Dist. Atty., for the District of South Dakota, Sioux Falls, S. D., and Michael. D. Howard, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

This action to recover a total of $259,-184.00 in taxes and deficiency interest, plus statutory interest, was tried to the court upon stipulated facts.

Plaintiffs, Marvin H. Teget and his wife, are joint taxpayers residing in Yankton, South Dakota, where Marvin has been employed since 1960 by Nicolson, Inc.[1] (hereinafter Nicolson or the corporation) as executive vice president and general manager. Teget at all times had a written contract with Nicolson. In 1965 this employment contract was amended to include a provision for deferred compensation. In general, the deferred compensation arrangement provided a formula whereby a certain sum was to accumulate in a fund to be paid out to Teget for a period of fifteen years after termination of his employment. As of 1968, Nicolson was obligated pursuant to this arrangement to Teget in the amount of $302,000.

Nicolson was principally a mail order seed and nursery company. For the fiscal year ending October 31, 1968, and for several years prior thereto, Nicolson was a duly elected Subchapter S corporation. The Tegets were minority shareholders. The events which lead to this lawsuit culminated in the spring of 1968, when Nicolson entered into a letter of intent, the terms of which provided that a corporation formed by foreign investors would purchase all of the operating assets of the seed and nursery company. All the current liabilities would also be assumed except as otherwise specified. One of the liabilities expressly not assumed was the $302,000 owed Teget as deferred compensation.

Shortly after the letter of intent was signed, the employment contract and the deferred compensation arrangement were modified to provide for the creation of a trust for the benefit of Teget in the event that all the assets of Nicolson were sold. Approximately 45 days later an asset purchase contract was executed between Nicolson and the purchasing corporation. Included among the assets sold was a growing crop inventory which on the date of sale had a total cost of $114,764.93. By appropriate corporate action, the shareholders of Nicolson adopted a plan of liquidation pursuant to Int.Rev.Code of 1954, Sec. 337. In its income tax return for fiscal 1968, Nicolson took a deduction for the cost of the unharvested crop. Following an audit, this deduction was disallowed by the Internal Revenue Service (hereinafter the IRS). Since Nicolson was a Suchapter S corporation, a portion of the alleged deficiency in federal income taxes assessed and collected from the taxpayers for the taxable year 1968 represents taxes attributable to the inclusion in income of the amount representing the

---

1. Prior to August 29, 1968, Nicolson, Inc., was known as Gurney Seed & Nursery Company.

taxpayers' share of the corporation's disallowed deduction.

The other amount in controversy concerns the deferred compensation Nicolson owed Teget. In accordance with the aforesaid modification of the employment contract, assets with a fair market value of $302,000 were transferred into a trust. Due to the terms of the trust agreement, Marvin Teget did not in 1968 and has not to date received any of above transferred principal. Plaintiffs, in their joint income tax return for 1968, did not report as income any of this $302,000. Nicolson did claim and was allowed a deduction for this amount. At oral argument, counsel for plaintiffs acknowledged that Nicolson claimed this deduction as the result of a misunderstanding between counsel for the corporation[2] and the accountants. At any rate, the statute of limitations has run as against Nicolson. Plaintiffs do, however, concede that should they prevail on this issue, their 1968 taxes will have to be adjusted upward by their ratable share of income attributable to the improper deduction allowed Nicolson. The issues will be discussed in the order argued and briefed.

## I. *Disallowance of the Unharvested Crop Expense*

The deduction was disallowed to Nicolson on the strength of section 268 (Int. Rev.Code of 1954, Sec. 268), which provides that:

> Where an unharvested crop sold by the taxpayer is considered under the provisions of section 1231 as "property used in the trade or business", in computing taxable income no deduction * * * attributable to the production of such crop shall be allowed.

The ultimate resolution of this issue requires resort to two other code sections, sections 1231(b)(4) and 337, in addition to section cited above. As is readily apparent, section 268 makes reference to section 1231 in determining whether the expenses of an unharvested crop are allowable as a deduction. Section 1231 is designed to accord certain property the best of both worlds, i. e., gains recognized under that section are considered capital gains rather than ordinary income but at the same time losses are treated as ordinary and not capital losses. One of the types of property which is afforded this desirable treatment is found at section 1231(b)(4):

> (4) *Unharvested Crop.*—In the case of an unharvested crop on land used in the trade or business and held for more than 6 months, *if the crop and the land are sold or exchanged * * at the same time and to the same persons,* the crop shall be considered as "property used in the trade or business." (emphasis added).

The crop in the instant case was sold to the buyers at the same time as the land and would qualify as section 1231 property (as distinguished from stock in trade, inventory or other property held for sale to customers in the ordinary course of business). The conclusion seems inescapable that reference to the above two quoted sections clearly mandates disallowance of any deduction for the cost of the unharvested crop. Nevertheless, plaintiffs argue that the above analysis is inappropriate in the instant case since there were no section 1231 gains involved.

Nicolson liquidated pursuant to section 337 which, briefly, provides that (1) if a corporation adopts a plan of complete liquidation and (2) within the 12 month period beginning on the date of the adoption of the plan, all assets of the corporation are distributed in complete liquidation, then *no gain or loss* will be recognized to the corporation. *See* Int. Rev.Code of 1954, Sec. 337(a). The taxpayers argue that the reference in section 268 is to *all* of section 1231, not just to 1231(b)(4), thus in a case where no section 1231 capital gains are involved, section 268 becomes irrelevant. This ar-

---

**2.** Mr. Walter R. Brown, co-counsel for plaintiffs in this action, was counsel for Nicolson at the time of the sale.

gument was presented to the Ninth Circuit Court of Appeals and the Tax Court in what is apparently the only reported decision on this issue, *Beauchamp & Brown Groves Co. v. Commissioner of Internal Revenue,* 371 F.2d 942 (9th Cir. 1967), *aff'g* 44 T.C. 117 (1965). The court in *Beauchamp* stated:

> Subsection (a) of section 1231 deals with gains and losses; subsection (b) provides definitions of "property used in the trade or business". Specifically among the definitions of subsection (b) is that of an unharvested crop as set out above. Section 268 directs us to section 1231 to find out which unharvested crops are "property used in the trade or business". No reference to the gain or loss provision of section 1231 is indicated. *Put more simply, the reference of section 268 to section 1231 is to subsection (b) rather than to the entire section.* (emphasis added).

*Beauchamp, supra,* at 944. Plaintiffs' argument that section 268 only comes into play when 1231 gains are recognized, and has no application where no gains are recognized pursuant to section 337, is supported by no authority. In fact it does not even square with their own conception of the statutes involved. Plaintiffs recognize that "in adopting Section 1231(b)(4) Congress also saw fit to attach a price tag—section 268." 44 T.C. at 124. Thus if Congress desired to attach a price tag when capital gains were allowed rather than ordinary income, it would seem even more logical to retain that price tag when a corporation receives an even larger bonus, in this instance nonrecognition *of any gain* pursuant to section 337. Moreover, the Treasury regulations point out that:

> In computing the taxable income no deduction shall be allowed in respect of items attributable to the production of an unharvested crop which is sold * * * with the land and which is considered as property used in the trade or business under section 1231(b)(4). * * * (emphasis added).

Treas.Reg. Sec. 1.268–1 (1957). After a review of the appropriate statutes, the surrounding legislative history and in light of *Beauchamp,* the court is persuaded that the deduction to Nicolson in 1968 was properly disallowed.

## II. The Tax Status of the Trust

The court is asked to determine whether the $302,000 set aside in trust for the benefit of Marvin H. Teget was properly taxable to him in 1968 under section 402(b) of the Internal Revenue Code or should not have been taxed to him as an allowable arrangement under Treas.Reg. Sec. 1.337–2(b) for the payment of a liability by Nicolson after the close of the 12 month distribution period of section 337.

The decision by Nicolson to liquidate incurred an obstacle since under the employment contract Teget was entitled to $302,000. A direct lump sum payment to Teget would result in severe tax treatment to him, moreover, retaining the income until Teget retired would disqualify Nicolson under section 337. Ultimately the trust arrangement was selected. Teget did not and has not received any of the principal deposited. Plaintiffs' tax return for 1968 did not report any of the $302,000 as income. A portion of the alleged deficiency in federal income taxes assessed against and collected from plaintiffs represents taxes attributable to the inclusion by the IRS of the entire $302,000 in plaintiffs' income for 1968.

The IRS included the trust principal in the taxpayers' income primarily on the basis of section 402(b). Prior to its amendment by the Tax Reform Act of 1969, 83 Stat. 590, that section read in pertinent part:

> (b) *Taxability of beneficiary of nonexempt trust.*—Contributions to an employees' trust made by an employer during a taxable year * * * of the trust for which the trust is not exempt from tax under section 501(a) shall be included in the gross income of an employee for the taxable year in which the contribution is made to the trust in the case of an employee whose beneficial interest in such contribution is nonforfeitable at the time the contribution is made. * * *

Section 501(a) of the Code provides (with certain exceptions not pertinent here) that if a trust meets the requirements of section 401(a), then such trust is exempt from taxation. Section 401(a) sets out detailed requirements for qualification as an exempt trust, subpart (4) of which specifies that trusts cannot discriminate in favor of highly paid employees. Since Teget was the only employee to benefit from the trust, and was a well compensated employee, the government argues that the trust fails to qualify under section 401(a). The result of failure to so qualify would of course require inclusion of the entire $302,000 in plaintiffs' income for 1968.

The government also cites the doctrines of constructive receipt, economic benefit and assignment of income. However, at oral argument counsel for the government acknowledged that this was more in the nature of blunderbuss pleading, the outcome hinged on the correct application of section 402(b).

Plaintiffs disagree with any attempt to characterize the trust created in 1968 as an employee trust. Their position is that it was a "liquidation trust", the existence of which was mandated by the provisions of section 337. In 1968, as these events were unfolding, the deferred compensation was to be paid out over a period of 15 years following Teget's termination of employment. Nonetheless, some disposition of this liability was necessary much sooner in order to fulfill section 337's 12 month distribution requirement. The trust, plaintiffs argue, was merely a good faith response to the Treasury Department's own regulations and statutes.

■ Reduced to its lowest common denominator, the issue becomes one of determining whether the instant trust arrangement is an "employee trust" as envisioned in section 402(b). The court has been unable to find a case squarely on point, nor have any been cited to it by the parties. Turning to the statutes and pertinent regulations, it is evident that section 402(b) does not define an "em-

ployee trust". However, section 402(a)(1) provides:

> (1) *General Rule*—Except as provided in paragraphs (2) and (4), the amount actually distributed or made available to any distributee by any employees' trust *described in section 401(a)* * * (emphasis added).

Section 401(a) in turn defines a qualified employee trust as:

> A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer *for the exclusive benefit* of his employees or their beneficiaries shall constitute a qualified trust . . . . (emphasis added).

It seems beyond cavil that at the heart of any "employee trust" as envisioned by Congress is a plan designed primarily for the benefit of employees.

■ Several factors, in the court's opinion, militate against labeling this arrangement an employee trust. (1) Neither party disputes the motivating force behind the creation of the trust. To effectively comply with the criteria of section 337, all of the assets had to be distributed within 12 months, less any assets retained to meet claims. Full compliance with that section was of paramount importance to the corporation. Clearly the trust was as much for the benefit of Nicolson's shareholders as it was for Teget. (2) The Treasury regulations themselves provide that:

> A corporation will be considered to have distributed all of its property other than assets retained to meet claims even though it has retained an amount of cash equal to its known liabilities and liquidating expenses plus an amount of cash set aside under arrangements for the payment after the close of the 12 month period of unascertained or contingent liabilities and contingent expenses. * * *

Treas.Reg. Sec. 1.337–2(b) (1975). The above section was further amplified in a Revenue Ruling which provided that "(t)he ability of the corporation to retain assets for the purpose of meeting expect-

. ed or contingent claims, as provided in section 1.337–2(b) of the regulations, does not prevent an alternative procedure of transferring funds *to a trustee* for the same purpose." (emphasis added). Rev.Rul. 72–137, 1972–1 C.B. 101. The amount due Teget under the employment contract was a contingent liability since under the contract no obligation existed until at least one event occurred, the termination of Teget's employment. *See Drysdale v. C. I. R.,* 277 F.2d 413, *rev'g* 32 T.C. 378 (6th Cir. 1960). (3) The employer-employee relationship between Nicolson and Teget was terminating at this time[3], quite unlike the ongoing employment relationship normally associated with an employee trust. In fact the trust was more in the nature of an arrangement between a liquidating corporation and a general creditor. As with all the other general creditors, the liability had to be taken care of in an acceptable manner within the 12 month liquidation period. (4) Teget has not received nor to date has a right to receive any of the $302,000. When he does in fact receive annual installments from the trust, Teget concedes that it will then be taxable to him.

The government's argument that not taxing this trust under section 402(b) will open the floodgates to further abuses is not persuasive, especially since this obligation existed long before the corporation's decision to liquidate. It was not the product of tax evasion. In essence the government is attempting to run with the hares and hold with the hounds. The regulations under section 337 anticipate occasions when resort to trust arrangements will be necessary. It seems an extremely harsh approach for defendants to seek to impose severe tax consequences for good faith attempts to meet their own regulations. The trust principal should be taxed as distributed.

The foregoing constitutes the findings of fact and conclusions of law of the court. The amount of tax owed by plaintiffs shall be recomputed per the agreement of counsel at oral argument. Counsel for plaintiffs shall prepare the appropriate order.

---

3. Teget is still employed at Nicolson, which prior to the sale was known as Gurney Seed and Nursery Company, but not by his original employer.