DOROTHY SCHWARTZ ROJAS, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

SCHWARTZ FARMS, INC., AND ESTATE OF CHARLES R. SCHWARTZ, DECEASED, BANK OF AMERICA, NATIONAL TRUST AND SAVINGS ASSOCIATION, ADMINISTRATOR WITH THE WILL ANNEXED, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 24029-82, 24064-82.     Filed May 25, 1988.

---

*Craig A. Houghton,* for the petitioner in docket No. 24029-82.

*Robert L. Sullivan, Jr.,* for the petitioners in docket No. 24064-82.

*M. Kendall Williams,* for the respondent.

## OPINION

WHALEN, *Judge:*\* Respondent determined deficiencies in the Federal income tax of petitioner Schwartz Farms, Inc., in the following amounts:

| TYE Jan. 31— | Deficiency |
| --- | --- |
| 1975 | $1,782 |
| 1977 | 742,222 |
| 1978 | 284,256 |
| Total | 1,028,260 |

Respondent also determined that petitioners, Dorothy Schwartz Rojas and the estate of Charles R. Schwartz, deceased, were liable for such amount as transferees.[1]

These cases were consolidated for trial, briefing, and opinion. After concessions, the only issue for decision is whether the tax-benefit rule requires Schwartz Farms, Inc., to report as income the amount which it deducted as expenses for materials and supplies which it used and consumed in connection with the cultivation of crops prior

---

\*By order of the Chief Judge, these cases were reassigned to Judge Whalen for decision and opinion.

[1]Although the notice of deficiency relates to the 3 taxable years of Schwartz Farms, Inc., set out above, the notices of transferee liability relate only to the year ending Jan. 31, 1977. Neither party has provided any explanation for, or raised any question concerning, this apparent discrepancy.

to its liquidation and the distribution of the crops to its shareholders.

All the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference.[2]

Petitioner Dorothy Schwartz Rojas (Dorothy) resided in Ventura, California, at the time her petition in this case was filed. Dorothy is the surviving spouse of Charles R. Schwartz, deceased (decedent).

Petitioner Estate of Charles R. Schwartz, deceased, acting by and through Bank of America, National Trust & Savings Association, administrator (estate), is the successor in interest to the decedent, who died on April 6, 1976. The estate maintained offices at Fresno, California, at the time its petition in this case was filed.

Decedent's will was admitted to probate in the Superior Court of California, for the County of Kings, on May 14, 1976. In accordance with the California Probate Code, Dorothy elected to subject her entire interest in the community property to administration in the estate. Consequently, the estate succeeded to the ownership of all the assets owned by decedent and Dorothy as their community property as of April 6, 1976. On June 12, 1984, the probate estate of decedent was distributed, approximately evenly between the Charles R. Schwartz Testamentary Trust (trust) and Dorothy. The estate is a transferee of petitioner Schwartz Farms, Inc. (corporation), and Dorothy and the trust are transferees of the estate. Respondent has not determined transferee liability against the trust.

The corporation was organized under the laws of California on April 8, 1954. The principal office of the corporation was in Fresno, California, at the time its petition in this case was filed. For Federal income tax purposes, the corporation reported income on the basis of a fiscal year ending January 31, and consistently used the cash basis method of accounting. At all relevant times the corporation was engaged in the business of farming row crops, primarily cotton, barley, wheat, and lettuce.

---

[2]Petitioners object, on the grounds of relevancy, to par. 10, 11, and 12, and the last sentence of par. 5 of the stipulation. We disagree and include them in our findings of fact.

On October 1, 1976, the corporation adopted a plan of complete liquidation under section 337 of the Internal Revenue Code of 1954. From the date of decedent's death, April 6, 1976, until October 1, 1976, there were issued and outstanding 198,600 shares of the corporation's common capital stock, which were owned, beneficially and of record, as follows:

| Shareholder | Number of shares |
|---|---|
| Charles R. Schwartz | 93,496 |
| Dorothy Schwartz | 93,496 |
| William Thornton | 4,104 |
| Genevieve Thornton | 4,104 |
| Charles R. Schwartz, Jr | 1,000 |
| Diana J. Schneider | 800 |
| Sylvia J. Thornton | 800 |
| Claudia Thornton Whitener | 800 |

The shares which are listed as owned by Charles R. Schwartz and Dorothy Schwartz were the community property of decedent and Dorothy on April 6, 1976, and, pursuant to Dorothy's election, became a part of the estate, along with all of their other community property.

The community property interest of Charles R. Schwartz in the corporation's common stock was included in decedent's gross estate for Federal estate tax purposes. On a timely filed estate tax return, the assets included in decedent's Federal gross estate were valued as of the alternate valuation date.

Pursuant to the plan of liquidation, cash distributions were made to the following shareholders:

| Shareholder | Amount |
|---|---|
| William Thornton | $91,806.48 |
| Genevieve Thornton | 91,806.48 |
| Charles R. Schwartz, Jr | 22,370.00 |
| Diana J. Thornton | 17,896.01 |
| Sylvia J. Thornton | 17,896.01 |
| Claudia Thornton Whitener | 17,896.01 |
| | 259,670.99 |

On October 26, 1976, all of the corporation's operating assets were distributed to the estate pursuant to the plan of liquidation. Such assets were assigned fair market values on October 26, 1976, as follows:

| Description of item | Fair market value |
|---|---|
| Crops | |
| Cotton—lint total ................................. | $1,931,052 |
| Cotton—seed ...................................... | 81,956 |
|    Less reported by corporation ..................... | (94,621) |
|    Less total harvest costs ......................... | (267,146) |
|    Plus harvest cost by corporation ................. | 4,500 |
|       Total cotton .............................. | 1,655,741 |
| Wheat crop ...................................... | 41,552 |
| Barley .......................................... | 271,006 |
| Lettuce ......................................... | 108,622 |
|       Total crops ............................... | 2,076,921 |
| Canal stock ........................................ | 67,350 |
| Prepaid rent........................................ | 2,100 |
| Unamortized lease costs.............................. | 234,200 |
| Cotton allotment ................................... | 0 |
| Land............................................... | 432,320 |
| Buildings—net of depreciation ....................... | 261,226 |
| Pipelines and sprinklers—net ........................ | 86,391 |
| Pumps and wells—net................................ | 52,211 |
| Domestic water system—net ......................... | 3,214 |
| Drainage system—net................................ | 24,471 |
| Machinery and equipment—net ....................... | 68,627 |
|       Total........................................ | 3,309,031 |

All the remaining assets of the corporation were thereafter distributed to the estate during 1977 and 1978, with a final distribution of $100 on January 31, 1979.[3] Pursuant to the plan of liquidation, all the outstanding shares of the corporation were surrendered and canceled.

As noted above, among the assets distributed by the corporation to the estate on October 26, 1976, were the following crops: harvested barley, harvested wheat, harvested cotton (lint and cotton seed), harvested lettuce, unharvested fall lettuce, and unharvested cotton.[4] The unharvested lettuce represented approximately 50 percent of the 1976 fall lettuce crop, and the unharvested cotton represented approximately 76 percent of the 1976 cotton crop.

On the corporation's return for the taxable year ended January 31, 1977, the corporation deducted all the costs

[3] No issue has been raised by the parties about the fact that the final distribution took place more than 12 months after the date on which the corporation adopted the plan of complete liquidation under sec. 337.

[4] No suggestion has been made by the parties that sec. 268 ("sale of land with unharvested crop") is applicable in this case.

and expenses incurred in connection with the cultivation and harvesting of the crops that were distributed on October 26, 1976, pursuant to the plan of liquidation. The total expenses thus deducted for each crop and the portion thereof which respondent seeks to include in income are as follows:

|  | Expenses deducted | Income adjustment[5] |
|---|---|---|
| Cotton | $739,479 | $692,379 |
| Wheat and barley | 333,564 | 157,909 |
| Lettuce | 59,616 | 59,616 |
| Total | 1,132,659 | 909,904 |

All the crop costs deducted were incurred in the ordinary course of the corporation's business and represented expenditures for all costs incurred up to the liquidation date in connection with the growing of the crops, including seed, fertilizer, water, labor, equipment rent and maintenance, pesticide, supervision, and general administrative overhead. All materials purchased in connection with each crop were used and applied in cultural practices prior to October 26, 1976, and no portion thereof was inventoried or distributed to the shareholders in liquidation.

After the liquidation distribution, the estate continued to use the operating assets which it received in the conduct of a farming operation similar to the operation conducted by the corporation before the distribution. The estate sold all of the crops that were distributed to it in liquidation in the ordinary course of such business.

As a result of the complete liquidation of the corporation, the estate and Dorothy realized a long-term capital gain of $681,514, measured by the difference between the fair market value of all the assets (net of liabilities) distributed to them in liquidation and the income tax basis of the corporation's stock in their hands.

Each of the assets received by the estate in the October 26, 1976, liquidation distribution had an income tax basis in the hands of the estate equal to the fair market value of

[5] In calculating the amount of the adjustment, the parties agreed in the stipulation of facts to reduce the total expenses with respect to each crop by the same ratio which crop sales reported by the corporation on its return bears to the total proceeds from sales of the crops.

each such asset determined as of the date of distribution pursuant to section 334(a).[6]

The notice of deficiency issued to the corporation determined that additional income should be included in the corporation's return for the year ending January 31, 1977, on the ground "that the accrual method of accounting clearly reflects your income." As an alternative theory, respondent determined that, "if it is found that the accrual method of accounting does not clearly reflect income for the tax year ending January 31, 1977," then assignment of income principles required $628,217 of the crop income to be included in the corporation's income for the tax year ending January 31, 1978.

In its second amendment to answer, respondent abandoned both the accrual method of accounting theory and the assignment of income theory and the parties have stipulated as follows:

> The parties agree that the sole issue for decision by the Court is whether, under the tax benefit rule as set forth by the United States Supreme Court in *Hillsborough [sic] National Bank v. Commissioner* and *United States v. Bliss Dairy, Inc.*, 460 U.S. 370 (1983), Schwartz Farms, Inc. is required to restore to income crop costs in the amount of $909,904.00 * * *

In view of the fact that respondent abandoned application of the accrual method of accounting and application of the assignment of income doctrine in this case, we have not considered either such theory and limit our opinion to the application of the tax-benefit rule.[7]

---

[6]Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

Sec. 334(a) provides:

SEC. 334(a). GENERAL RULE.—If property is received in a distribution in partial or complete liquidation (other than a distribution to which section 333 applies), and if gain or loss is recognized on receipt of such property, then the basis of the property in the hands of the distributee shall be the fair market value of such property at the time of the distribution.

[7]We note that petitioners object to allegations by respondent in par. 8(u) of his second amendment to answer that:

"No valid business reason existed to distribute the crops at this time as all the crops would have been harvested within 30 days. The reason for this distribution was to avoid the taxation on the proceeds from the crops."

Respondent has the burden of proving any new matter raised in his answer. Rule 142(a). Petitioners argue that respondent has failed his burden of proof on this issue. Respondent maintains that the timing of the distribution indicates that the corporation had no business reason other than tax avoidance for the distribution in this case.

The tax-benefit rule is a judicially created doctrine, embodied in part in section 111. It operates to rectify certain distortions which would be brought about by the inflexible application of the annual accounting system used in reporting Federal income taxes. *Hillsboro National Bank v. Commissioner* and *United States v. Bliss Dairy, Inc.,* 460 U.S. 370, 377 (1983) (hereafter *Bliss Dairy*). The application of the tax-benefit rule is frequently illustrated by reference to collection of a debt which had been deducted in a prior tax year under section 166(a) as a bad debt. 460 U.S. at 377. In such case, the so-called "inclusionary component" of the tax-benefit rule requires the taxpayer to recognize the repayment as income in the year of recovery. Otherwise, the repayment, a return of capital, would not be taxable and the Government might be foreclosed from recouping the tax-benefit attributable to the prior deduction. Under the so-called "exclusionary component," the amount included in the year of recovery is limited to the amount of the tax-benefit received from the deduction in the prior year. See sec. 111(a).

The above illustrates the application of the tax-benefit rule where the taxpayer has made an actual recovery of the amount previously deducted. As first formulated, such a recovery was required for application of the rule. See, e.g., *Nash v. United States,* 398 U.S. 1 (1970). Under the Supreme Court's formulation of the rule in *Bliss Dairy,* however, the purpose of the rule is not simply to tax "recoveries" but is to approximate the results produced by a tax system based on transactional rather than annual accounting, i.e., "to achieve rough transactional parity in tax." *United States v. Bliss Dairy, Inc., supra* at 381-383. The tax-benefit rule will be applied when it appears that a later unforeseen event is "fundamentally inconsistent with the premise on which the deduction was initially based," in

However, neither party has shown, and we do not find, that the existence of a valid business reason or the lack thereof is relevant to the issue in this case, i.e., whether the tax-benefit rule requires that the corporation include in its income previously deducted expenses. The tax-benefit rule ordinarily applies to require the inclusion in income when events occur which are fundamentally inconsistent with an earlier deduction or when there has been a recovery of a previously deducted item. Because the existence or absence of a valid business reason for the liquidation is irrelevant to the determination of whether there has been an inconsistent event or a recovery in this case, we decline to find facts relating to the existence of a valid business reason for the liquidation.

the sense that the deduction would have been foreclosed if the event had occurred in the same taxable year. 460 U.S. at 383-384. The Court made it clear, however, that not every unforeseen event will require application of the tax-benefit rule. 460 U.S. at 383.

The Supreme Court refused to adopt a blanket rule for application of the tax-benefit rule but stated that it must be applied on a "case-by-case basis." It charged lower courts with the obligation of considering "the facts and circumstances of each case in the light of the purpose and function of the provisions granting the deductions." *United States v. Bliss Dairy, Inc., supra* at 385-386.

The taxpayer in *Bliss Dairy* was a closely held corporation engaged in the business of operating a dairy. It reported income on the cash method of accounting and properly deducted certain cattle feed which it purchased for use in its business during its fiscal year ending June 30, 1973. The deduction was based upon section 162(a). After the beginning of its next fiscal year, the corporation adopted a plan of liquidation under sections 333 and 336 and, thereafter, distributed to its shareholders all of its assets, including the cattle feed then on hand. After the liquidation, the shareholders continued to operate the dairy business in noncorporate form.

The Supreme Court began its analysis of the tax-benefit rule in *Bliss Dairy* by examining the purpose and function of section 162(a) under which the cost of the unused feed was deducted, and it noted as follows:

Section 162(a) permits a deduction for the "ordinary and necessary expenses" of carrying on a trade or business. The deduction is predicated on the consumption of the asset in the trade or business. See Treas. Reg. section 1.162-3, 26 CFR section 1.162-3 (1982) ("Taxpayers * * * should include in expenses the charges for materials and supplies only in the amount that they are *actually consumed and used in operation* in the taxable year * * * ") [*United States v. Bliss Dairy, Inc., supra,* at 395. Emphasis in original.]

The Court then reasoned that the distribution of the grain to the shareholders in liquidation of Bliss Dairy, Inc., was a nonbusiness use of the grain, analogous to personal consumption, explicitly made nondeductible by section 262. The Court held that the liquidation was "fundamentally incon-

sistent" with the earlier deduction of the cost of the grain because it converted the grain to a nonbusiness use and, thus, frustrated consumption of the grain in the business, the premise on which the deduction was allowed. *United States v. Bliss Dairy, Inc., supra* at 395-396.

Like *Bliss Dairy,* the deductions at issue in this case were taken by the corporation prior to its liquidation and there was no subsequent recovery of those deductions. Like *Bliss Dairy,* the operating assets of the corporation were distributed to its shareholders in the liquidation, and they continued to operate the business in noncorporate form. Petitioners do not challenge the conclusion of the Supreme Court that a liquidating distribution of an asset is a conversion of that asset to a nonbusiness use nor do they challenge the Court's holding that the nonrecognition language of section 336 does not permit a liquidating corporation to avoid the tax-benefit rule. Like *Bliss Dairy,* the deductions here were taken under section 162. Therefore, the issue in this case is the same as the issue framed by the Supreme Court in *Bliss Dairy,* namely, whether the distribution of the operating assets of the corporation, a nonbusiness use, is "fundamentally inconsistent" with the "purpose and function" of section 162, under which the deductions at issue were taken.

The liquidation in *Bliss Dairy* took place in a taxable year after the year in which the deductions were taken, whereas the liquidation in the instant case took place within the same taxable year. Petitioners seize upon such difference and argue that the tax-benefit rule is inapplicable where the inconsistent event takes place within the same taxable year as the deduction. We are constrained to reject this argument under *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). The Ninth Circuit, the court to which an appeal of this case lies, has held—in a case cited with approval in *United States v. Bliss Dairy, Inc., supra* at 401—that tax-benefit principles apply in such a case with even greater force, even though use of the "tax-benefit rule" label may be inappropriate. *Spitalny v. United States,* 430 F.2d 195, 198 (9th Cir. 1970). The court also stated in *Spitalny* that it is of "no consequence" whether the adjustment takes the

form of a disallowance of an item of expense or a restoration to income. 430 F.2d at 198.[8]

The only significant difference between this case and *Bliss Dairy* is the fact that the parties have stipulated, and we have found, that the cost of the materials and services at issue were incurred in the ordinary course of the corporation's farm business and that all of the materials purchased were "used and applied in cultural practices" prior to the liquidation and no portion of such materials was inventoried or distributed to the shareholders in liquidation. In *Bliss Dairy,* on the other hand, the deductions at issue represented the cost of unconsumed cattle feed which was distributed to the shareholders.

Petitioners note that the crop costs at issue consist of expenditures for seed, fertilizer, water, labor, equipment rent and maintenance, pesticide, supervision, and general and administrative overhead. They emphasize that all such materials and services were used and consumed in the ordinary course of the corporation's farming business prior to the liquidation and that no such materials and services were on hand at the time of the liquidation or distributed to the shareholders. In petitioners' view, therefore, such materials and services are similar to the cattle feed which had been consumed by the dairy cows in *Bliss Dairy* and the fundamental inconsistency on which the Court's decision in that case was based is not present here, inasmuch as those assets were consumed in the business and not converted to a nonbusiness use. Petitioners assert that *Bliss Dairy* requires us to reach a result opposite to the one in that case.

Respondent, on the other hand, also relies on *Bliss Dairy* but concludes that the Court's decision requires application of the tax-benefit rule here. In respondent's view, the Supreme Court held that a deduction under section 162 "presumes that an expense is necessary to produce income * * * [and] should no income result due to an intervening personal use of the asset," there arises a

---

[8]The Supreme Court described the tax-benefit rule as "cancelling out" an earlier deduction and, presumably, agrees with the Ninth Circuit that it is of no consequence whether the cancelling out takes place by way of a reduction of the deduction or an increase in income. *Hillsboro National Bank v. Commissioner* and *United States v. Bliss Dairy, Inc.,* 460 U.S. 370, 383 (1983).

fundamental inconsistency which requires application of the tax-benefit rule. Respondent does not deny that the materials and services at issue in this case were consumed but argues that "physical consumption of an asset should not be confused with business consumption as contemplated by section 162(a)."

Respondent, therefore, asks us to go beyond *Bliss Dairy* and to hold that deductions for services (such as labor, equipment rent and maintenance, supervision, and general and administrative overhead), all of which had been expended prior to the liquidation, and deductions for materials (such as feed, fertilizer, water, labor, and pesticide), none of which were on hand at the time of a liquidation, must be "cancelled out" under the tax-benefit rule. In respondent's view, this result is required because such materials and services were expended to produce crops which were not sold but were distributed in liquidation to the corporation's shareholders. Respondent argues that deductions under section 162 for such materials and services are predicated on the sale of the product produced and not just on the consumption of materials and services in the taxpayer's business.

In support of its position, respondent asserts that the Court in *Bliss Dairy* determined that deductions under section 162 are predicated on sale of the product produced from such expenses and the production of income. We disagree. In *Bliss Dairy,* the Court stated that deductions under section 162 are "predicated on the consumption of the asset in the trade or business." 460 U.S. at 395. The regulation, section 1.162-3, Income Tax Regs., on which the Supreme Court relied, states as follows:

Taxpayers carrying materials and supplies on hand should include in expenses the charges for materials and supplies only in the amount that they are *actually consumed and used* in operation during the taxable year for which the return is made, provided that the costs of such materials and supplies have not been deducted in determining the net income or loss or taxable income for any previous year. [Emphasis supplied].

To "consume" an asset means nothing more than to use it up. Webster's Third New International Dictionary 490 (1986). If an asset is used up in furthering the taxpayer's trade or business, as was the case with the materials and

services at issue, then the predicate for deducting the cost of the asset under section 162 would seem to be fulfilled.[9] Significantly, the Supreme Court, in examining the "purpose and function" of deductions under section 162 in terms of the facts in *Bliss Dairy,* makes no mention of sales of milk to be produced from the taxpayer's dairy cows.

We are not at liberty to speculate about the meaning of the words "actually consumed" and "used" as applied to seed, fertilizer, and other farm supplies. Congress made the meaning of such words clear in the legislative history of section 464(a), which was originally enacted in 1976. That provision states as follows:

> In the case of any farming syndicate (as defined in subsection (c)), a deduction (otherwise allowable under this chapter) for amounts paid for feed, seed, fertilizer, or other similar farm supplies shall only be allowed for the taxable year in which such feed, seed, fertilizer, or other supplies are *actually used or consumed,* or, if later, in the taxable year for which allowable as a deduction (determined without regard to this section). [Emphasis supplied.]

A farm business is normally entitled to use the cash method of accounting and to deduct seed, fertilizer, and other farm supplies under section 162 at the time such supplies are purchased. Section 464(a) provides that a "farming syndicate" which Congress considered to be abusive is entitled to deduct the cost of such materials no earlier than the taxable year in which they are "actually used or consumed." The legislative history of section 464(a) clarifies the intended meaning of those words as follows:

> This provision prevents a farm syndicate from obtaining current deductions for prepaid feed, seed, fertilizer, etc., except in situations where the feed, seed, fertilizer, or other supplies are *on hand* at the close of the taxable year *solely* because the consumption of such items during the taxable year was prevented on account of fire, storm, flood, or other casualty, or on account of disease or drought. [S. Rept. 94-938, at 61 (1976), 1976-3 C.B. (Vol. 3) 99. Emphasis supplied.]

---

[9]Judge Nims, in his dissent, states that "the phrase 'actually consumed and used in operation in the taxable year' includes both consumption *and* sale in the ordinary course of the taxpayer's business." (See p. 1110). Curiously, however, the regulation quoted above does not say "consumed and sold," as it easily could have, nor is that concept implicit therein. What the regulation does say is "actually consumed and used." An asset must be both used and consumed in the business before its cost is deductible under sec. 162. If the asset is used in the business but not consumed, a full deduction of its cost is not appropriate. See, e.g., *Tennessee Carolina Transportation, Inc. v. Commissioner,* 65 T.C. 440 (1975), affd. 582 F.2d 378 (6th Cir. 1978), cert. denied 440 U.S. 909 (1979).

In other words, if such crop materials are not "on hand" at the end of the taxable year, then they have been consumed in the farm business and may be deducted by a "farming syndicate." Even in the case of a farming syndicate, therefore, Congress stated its intention to allow farm supplies to be deducted when they are no longer "on hand" and, in allowing such deductions, Congress made no reference to the sale of the crops produced.

Section 1.162-12, Income Tax Regs., dealing with the deductibility of "expenses of farmers," is consistent with the view that farm materials and services are deductible under section 162 when used up in the farm business without regard to any sale of the crops produced. In the case of a farm operated for profit, that regulation provides as follows:

A farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts *actually expended* in the carrying on of the business of farming. [Emphasis supplied.]

Once again, there is nothing, either explicit or by necessary implication, in this provision to suggest that the deduction of crop expenses is predicated on eventual sale of the crop. In fact, to the contrary, the general rule under that regulation is that crop expenses are to be deducted as the amounts are expended. It is only "with the consent of the Commissioner" that a farmer may adopt the so-called "crop method," which allows deductions to be taken in the taxable year in which the gross income from the crop has been realized. Sec. 1.162-12, Income Tax Regs.

The issue here is more than a semantic difference between the respondent and petitioners over the meaning of the word "consumed." Respondent's application of the tax-benefit rule in this case is a significant expansion of the rule and, in our view, goes far beyond its intended scope. Under respondent's formulation, every business deduction under section 162 would be "cancelled out" if an unforeseen event, not just a corporate liquidation, frustrated the sale of any products which would otherwise have been completed and sold. In this case, it is particularly significant that respondent seeks to recapture deductions for general and administrative overhead and equipment maintenance costs.

Under the respondent's formulation of the rule, therefore, every taxpayer, regardless of its method of accounting, would be required to precisely allocate and recapture all of its business deductions attributable to the production of products every time an unforeseen event frustrated their sale. The respondent's formulation goes beyond "rough transactional parity." Such an expansive recapture rule is not contemplated by either the holding of *Bliss Dairy*, which is limited to recapture of the deduction for the cost of assets which were themselves distributed in the liquidation, or by the spirit of the case, which referred to the tax-benefit rule as a "limited rule." 460 U.S. at 389. Respondent has cited no authority which suggests that we should go beyond the holding of the Supreme Court in *Bliss Dairy*.

Respondent relies on our decision in *Byrd, Transferee v. Commissioner*, 87 T.C. 830 (1986), affd. without published opinion 829 F.2d 1119 (4th Cir. 1987). That case involved the deductibility of the cost of an "inventory" of young plants which had been purchased for resale but which were on hand at the time of the liquidation. In that case, resale was the act of consuming or using the young plants in the taxpayer's trade or business. We held that the liquidation transaction was inconsistent with the prior deduction of the cost of such unsold plants. Our opinion states, "We * * * view *Bliss Dairy* as controlling for our purposes." 87 T.C. at 837. The "fundamental inconsistency" which we found in that case is as follows:

Petitioners deducted the cost of young plants *purchased for sale* in their business after the plants had grown to mature size. Instead of selling the plants in the ordinary course of their trade or business and realizing income to offset the cost of production, petitioners distributed the plants to its shareholder in liquidation. [87 T.C. at 838; emphasis supplied.]

The young plants at issue in *Byrd*, like the feed at issue in *Bliss Dairy*, were not consumed in the trade or business but were on hand and distributed in the liquidation.

Our decision in *Tennessee Carolina Transportation, Inc. v. Commissioner*, 65 T.C. 440 (1975), affd. 582 F.2d 378 (6th Cir. 1978), cert. denied 440 U.S. 909 (1979), involved a corporation which engaged in the motor freight transportation business. Prior to its liquidation, the taxpayer purchased tires and tubes to be mounted on equipment already

in use. The cost of the tires and tubes was charged to expense, rather than capitalized, on the assumption that the average useful life of the tires and tubes was one year or less. We applied the tax-benefit rule on the theory that "Certain of the tires and tubes whose cost [the taxpayer] expensed were not fully consumed in its operations * * * [but] were distributed by [the taxpayer] in liquidation when a substantial portion of their useful life had not been exhausted." 65 T.C. at 446. In applying the tax-benefit rule in that case, we required the taxpayer to include in gross income, not the original cost of the tires and tubes, but the portion of such cost allocable to their remaining useful life. It was that portion which had not been consumed in the taxpayer's operations and, therefore, only that portion which was inconsistent with a deduction under section 162.

In *Spitalny v. United States,* 430 F.2d 195 (9th Cir. 1970), the Ninth Circuit, to which this case is appealable, applied the tax-benefit rule in connection with the liquidation, under section 337, of a cattle feeding business. Unlike dairy cows, such as those involved in *Bliss Dairy,* which are fed and maintained in order to produce milk for sale, a cattle feeding business purchases cattle to be fattened and then resold at a profit. In *Spitalny,* the court applied the tax-benefit rule to "cancel out" the taxpayer's deductions with respect to the feed and supplies sold in connection with the section 337 liquidation. The court stated as follows:

We agree with the Government that distortion of income results from appellees' accounting method. The expense deduction as permitted by regulation is intended to reflect the cost of feed *actually* consumed during the taxable year and to accomplish over a period of years roughly the same result as would have been had through use of the inventory method, but by a simpler form of accounting. [430 F.2d at 197; emphasis in original.]

Once again, the tax-benefit rule was applied only to the expensed assets which were on hand and not to materials and supplies which had been consumed.

Similarly, in *Estate of Munter v. Commissioner,* 63 T.C. 663 (1975), we applied the tax-benefit rule in the case of a laundry business which also engaged in the business of renting linen items and garments. That case involved an

accrual method taxpayer which inventoried its cost of linen supplies and other rental items as they were purchased. When a rental item was placed in service by delivery to a customer, the cost of the item was removed from the inventory account and charged to expense. Accordingly, when the corporation adopted a plan of liquidation under section 337 and sold its assets, there were substantial linen items which had been fully deducted but which had not been actually consumed in the business.

In *Gorton v. Commissioner,* T.C. Memo. 1985-45, we applied the tax-benefit rule to the liquidation of a chicken and egg ranch which distributed an inventory of materials to a trust which continued to operate the business for the benefit of the former shareholders. In applying the tax-benefit rule, we noted that the materials had previously been deducted under section 162 and that "the corporation would have received the benefit of the deduction without using these items in its business, as intended by section 162(a)." We find nothing in *Gorton v. Commissioner* to suggest that deductions under section 162 are predicated on more than the use and consumption of the asset in the taxpayer's business.

Lastly, in *Ballou Construction Co. v. United States,* 611 F. Supp. 375 (D. Kan. 1985), the taxpayer was engaged in the business of extracting, processing, and selling sand and gravel from sand and gravel pits before it liquidated and distributed its assets to a new corporation which claimed a stepped-up basis for the assets under section 334(b)(2). The case involved the application of the tax-benefit rule to costs which had been incurred and deducted by the taxpayer for removal of overburden, a step necessary before sand and gravel can be removed from a sand and gravel pit. The parties stipulated that removal of the overburden enhanced the value of the "sand deposit in place," one of the assets distributed in the liquidation, by $20,000.[10] The court applied the tax-benefit rule to increase the taxpayer's income by the same amount.

It appears that the taxpayer in *Ballou Construction* did not raise the issue before us here, i.e., whether the

---

[10]It is not clear what relationship, if any, such amount bore to the costs of removal of the overburden which had been deducted.

tax-benefit rule can be applied to cancel out business deductions for materials and services which are consumed in the business before a liquidating distribution. In fact, the court treated the "sand deposit in place" as the equivalent of the unconsumed feed in *Bliss Dairy*. The court stated as follows:

The premise of a deduction under section 162(a) is that an expensed asset will be consumed by the taxpayer in his trade or business. Salina Sand's later distribution was an inconsistent event with the deduction for two reasons. First, the taxpayer who sells rather than consumes an expensed asset will lose the deduction because the full amount of the proceeds must be recognized. Second, Salina Sand's distribution of the "Sand Deposit in Place" to its shareholder "turns the expensed asset to the analog of personal consumption" and thus the assumption underlying the original deduction is proven invalid. [611 F. Supp. at 378.]

It is clear that the court simply applied the logic of the Supreme Court in *Bliss Dairy* to the facts before it on the assumption that the deducted costs were directly attributable to the sand deposit in place, an asset which had not been consumed. The court was not called upon to consider the issue in this case. Moreover, the language quoted above provides no support for respondent's position in this case that deductions under section 162(a) are premised on the sale of the product produced, rather than on consumption of the expensed asset in the taxpayer's business.

Historically, farmers have had the option of using the cash method of accounting without the need to accumulate inventories or to use the inventory method of accounting. Sec. 39.22(c)-6(a), Regs. 118; sec. 1.471-6(a), Income Tax Regs.; sec. 1.61-4, Income Tax Regs.; *Hi-Plains Enterprises, Inc. v. Commissioner*, 60 T.C. 158 (1973), affd. 496 F.2d 520 (10th Cir. 1974). A cursory review of certain farm tax provisions shows that Congress intended to provide farmers with "more liberal accounting rules than those generally applicable in the case of other types of business activities." H. Rept. 91-413 (Part 1), at 62 (1969), 1969-3 C.B. 240; S. Rept. 94-938, at 52 (1976), 1976-3 C.B. (Vol. 3) 90. Congress also recognized that the special farm accounting rules required no matching of deductions and income and, therefore, contemplated that distortions would result. For example, in connection with its passage of section 207(a) of the

Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1536, adding section 464 to the Code, the Senate Report, S. Rept. 94-938, *supra* at 53-54, 1976-3 C.B. (Vol. 3) at 91-92, states as follows:

Farm investments offer an opportunity to defer taxes on nonfarm income where investors can take advantage of the special farm tax rules to deduct farm expenses in a year or years prior to the years when the revenue associated with such expenses is earned. This type of deferral can occur regardless of whether the proceeds from the later sale of the underlying products are taxed at ordinary income or capital gain rates. Generally, in farming operations tax losses can be shown in early years of an investment because of (1) the opportunity to deduct, when paid, costs which in nonfarm businesses would be inventoried and deducted in a later year, (2) the ability to deduct, when paid, costs which should properly be capitalized, and (3) the ability to claim depreciation deductions which exceed straight-line depreciation.

These tax losses may offset income from a taxpayer's other nonfarm occupations or investments on which he would otherwise have to pay tax currently. When the income which is related to these deductions is reported, it will not be reduced by the amount of the deductions properly attributable to it (and will thus be greater in net amount than it otherwise would be). This lack of matching results in deferral of taxes from the years when the initial deductions were taken. If the related farm income is eventually realized as capital gain (as it may be where breeding animals or orchards are sold), conversion of ordinary income (against which the expenses were deducted) into capital gain may also result. Even without the possibility of conversion, however, the tax advantages of deferral alone are frequently sufficient to motivate many high-income taxpayers to engage in certain types of farming activities.

Through the years, Congress has imposed some limits on the use of the special farm accounting provisions in the case of farm syndicates and the like but, as recognized during passage of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, "Most farmers use the cash method of accounting, and therefore do not maintain inventories or capitalize preproductive period costs (i.e., costs incurred prior to the time a plant or animal becomes productive)." H. Rept. 99-841 (Conf.), at II-112 (1986), 1986-3 C.B. (Vol. 4) 112.

It would appear, therefore, that Congress intended to allow farm businesses, like Schwartz Farms, Inc., to deduct crop costs without the necessity of matching such costs against the income which would be realized from the sale of the crops themselves. Nevertheless, respondent's position in this case is that the crop costs which are otherwise

deductible under section 162 at the time paid should be "inventoried" and recaptured in the event there is no business sale of the crop produced. We agree that *Bliss Dairy* requires recapture with respect to any farm materials on hand at the time of a liquidation, but we fail to see that the tax-benefit rule requires the cost of materials and supplies consumed in the farm business to be recaptured in this case, in view of the clear legislative intent to allow most farmers to dispense with the need to accumulate inventories. Cf. Rev. Rul. 85-186, 1985-2 C.B. 84, where respondent recognized that application of the tax-benefit rule to deductions for research and experimentation under section 174(a) was inappropriate in view of clear legislative intent to relieve taxpayers of the obligation to allocate costs between amounts currently deductible and amounts required to be capitalized.

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, WHITAKER, KÖRNER, COHEN, CLAPP, SWIFT, WRIGHT, WILLIAMS, and WELLS, *JJ.,* agree with the majority opinion.

GERBER, *J.* did not participate in the consideration of this opinion.

---

NIMS, *J.,* dissenting: I respectfully dissent. By its action in this case the majority reopens a loophole which the Supreme Court thought it had closed in *Hillsboro National Bank v. Commissioner* and *United States v. Bliss Dairy, Inc.,* 460 U.S. 370 (1983). This arises through the combination of allowance of corporate deductions under section 162 for the cost of materials and supplies, plus the step-up in basis of the corporate assets distributed in liquidation by virtue of former section 337 which are thereafter sold by the shareholders at little or no gain. This result is not only inconsistent with *Bliss Dairy;* it also conflicts directly with our recent holding in *Byrd, Transferee v. Commissioner,* 87 T.C. 830 (1986), affd. without published opinion 829 F.2d 1119 (4th Cir. 1987).

In *Byrd,* the Commissioner asserted that expenses incurred by nurserymen in growing plants are normally deductible because the plants will be sold to customers in the ordinary course of business. However, since the plants in *Byrd* were distributed to shareholders in a corporate liquidation, this treatment was fundamentally inconsistent with the purpose behind the section 162 deduction. 87 T.C. at 836. Agreeing with the Commissioner, we held that since the corporate taxpayers distributed the plants to their shareholders in liquidation, the tax-benefit rule requires that they include in income the amount of their "unwarranted deduction." 87 T.C. at 838. Stare decisis mandates that this holding be applied to the facts now before us.

By reading the facts of *Byrd* selectively, it might be suggested that only the cost of the young plants distributed in liquidation, but not the cost of materials and supplies used to nurture them, were required to be recaptured. This is the only conceivable basis on which *Byrd* could be distinguished from this case. But to apply this bizarre distinction consistently, the majority should, at a minimum, disallow the cost of seeds. Even the majority must admit that seeds are but the precursors of young plants.

The majority places more weight on the Supreme Court's use of the words "consumption of the asset" in *Bliss Dairy* (460 U.S. at 395) than those words should be required to bear alone. The regulation from which the Supreme Court derived the concept of consumption is section 1.162-3, Income Tax Regs., which is quoted in relevant part in *Bliss Dairy* as follows: "Taxpayers * * * should include in expenses the charges for materials and supplies only in the amount that they are *actually consumed and used in operation* in the taxable year" (emphasis by the Supreme Court). 460 U.S. at 395. The phrase "actually consumed and used in operation in the taxable year" includes both consumption *and* sale in the ordinary course of the taxpayer's business in the taxable year. Since the expensed items in the present case were consumed but not used in operation, and since the crops which they produced were distributed to the shareholders, the tax-benefit rule must be invoked.

Our holding in *Mars, Inc., and Uncle Ben's, Inc. v. Commissioner,* 88 T.C. 428 (1987), is not inconsistent with *Bliss Dairy* or with *Byrd. Mars and Uncle Ben's* involved the incorporation of a foreign loss branch by the taxpayer. We held that the incorporation of a foreign loss branch is not a fundamentally inconsistent event as that term is defined in *Bliss Dairy* and that to hold otherwise would suggest taxability under *Bliss Dairy* on incorporation of any partnership that had incurred losses.

Unlike the situation in *Bliss Dairy, Byrd* and, I submit, the case before us, the taxpayers in *Mars and Uncle Ben's* did not convert expensed assets to some other, nonbusiness use which was inconsistent with earlier deductions. See *Bliss Dairy,* 460 U.S. at 395.

For the foregoing reasons, I would hold for respondent.

CHABOT, PARKER, SHIELDS, HAMBLEN, JACOBS, PARR, and RUWE, *JJ.,* agree with this dissent.

---

HAMBLEN, *J.,* dissenting. I agree with and join the dissenting opinion of Judge Nims. The action of the majority in this case does more than "reopen a loophole which the Supreme Court thought it had closed in *Bliss Dairy";* its action erodes the tax-benefit rule.

The majority suggests that respondent would have us go beyond *Bliss Dairy.* I, however, submit that respondent is asking us only to be consistent with the rule of that case.

In *Bliss Dairy,* the Supreme Court established the tax-benefit rule's parameters, stating, "the tax benefit rule will 'cancel out' an earlier deduction only when a careful examination shows that [a] later event is indeed fundamentally inconsistent with the premise on which the deduction was initially based." (Fn. ref. omitted.) *Hillsboro National Bank v. Commissioner,* and *United States v. Bliss Dairy, Inc.,* 460 U.S. 370, 383 (1983). In establishing this version of the rule, the Supreme Court noted the rule's rationale and opined, the purpose of the rule "is to approximate the results produced by a tax system based on transactional rather than annual accounting."[1] *Hillsboro National Bank v.*

---

[1]The majority accurately notes that the purpose of the tax-benefit rule is "to achieve rough transactional parity in tax." Throughout their analysis, however, this same majority stresses the deduction of items at the expense of a fully developed discussion related to the second

*Commissioner,* 460 U.S. at 381 (citations omitted; emphasis added); see also *Hillsboro National Bank v. Commissioner,* 460 U.S. at 377, 378 n. 11, 383, and 388-389. Such a transactionally based tax system would necessitate that, to the greatest extent possible, *expenses* be *matched* with the *income* to which the expenses are associated. Cf. *Byrd, Transferee v. Commissioner,* 87 T.C. 830, 834 (1986), affd. without published opinion 829 F.2d 1119 (4th Cir. 1987) ("The tax benefit rule avoids distortion of income").

After noting the rule's rationale, the Supreme Court then examined the rule's application. The tax-benefit rule functions on a case-by-case basis. In applying the rule, "A court must consider the facts and circumstances of each case in the light of the purpose and function of the provisions granting the deductions." *Hillsboro National Bank v. Commissioner,* 460 U.S. at 385.

In the case before us, just as in *Bliss Dairy,* the applicable statutory provision under which deductions were taken is section 162(a). In examining the purpose and function of this deduction, the Supreme Court first states, "The deduction is predicated on the consumption of the asset in the trade or business," *Hillsboro National Bank v. Commissioner,* 460 U.S. at 395, and cites section 1.162-3,[2] Income Tax Regs., for this proposition. The majority stresses this language but fails to mention that the Supreme Court later emphasizes that a taxpayer should be granted a section 162 deduction only for "those expenses attributable to the business of the taxpayer," those "direct expenses he has incurred *in connection with his income." Hillsboro National Bank v. Commissioner,* 460 U.S. at 396 (emphasis in original). In explaining the purpose and function of section 162, the Supreme Court thus reaffirms the longstanding link between a section 162 deduction and the generation of income by a trade or business.[3]

---

prong of transactional parity—the generation of income. The majority's decision to ignore income generation obviates what in essence is the sine qua non of transactional parity—the matching of income and expense. As such, the majority's failure to ask "Where's the income?" reminds one of a hamburger purchaser's failure to ask, "Where's the beef?"

[2]This regulation was initially issued under the authority of sec. 7805. 1958-1 C.B. 63.

[3]That a longstanding link exists between a sec. 162 deduction and the generation of income can be found in tracing the section's statutory roots. In examining the purpose of sec. 162, the Supreme Court quoted from hearings before the House Committee on Ways and Means of the 75th Congress and noted the section's 1916 predecessor. A further look to the section's

A careful consideration of section 1.162-3, Income Tax Regs., additionally reveals this nexus between deduction and income generation. The regulation provides:

> Taxpayers carrying materials and supplies on hand should include in expenses the charges for materials and supplies only in the amount that they are actually consumed and used *in operation during the taxable year* for which the return is made, provided that the costs of such materials and supplies have not been deducted in determining the *net income or loss or taxable income for any previous year.* \* \* \* [Emphasis added.]

Words of import in this regulation include the words "in operation during the taxable year" and those preventing double deductions. The phrase "in operation during the taxable year" necessarily entails the primary activity for which all trades and businesses are formed and managed— the generation of income.[4] The language preventing double deductions inextricably ties a deduction to income—to the extent an expense has reduced income generated in one taxable period, it may not reduce income generated in succeeding periods.

Furthermore, we have clearly accepted this link between deduction and income generation. In *Byrd, Transferee v. Commissioner*, 87 T.C. at 838, we declared, "Pursuant to section 162(a), the deduction for young plants purchased in the ordinary course of business is allowed with a view to recouping this expense when the plants reach maturity and are thereafter sold."[5]

---

forebears reveals an even closer link between the taking of the deduction and the generation of income. The act of March 3, 1865, provided that "In estimating deductions from income \* \* \* when any person rents buildings, lands, or other property, or hires labor to cultivate land, or to conduct any other *business from which such income is actually derived,* \* \* \* the amount actually paid \* \* \* shall be deducted." Sec. 1 of H.R. 744, 38th Cong., 2d Sess., ch. 78, 13 Stat. 469, 479. (Emphasis added.)

[4]In its opinion, the majority finds it necessary to refer to the dictionary definition of "consume." I also find it necessary to emphasize the definition of "business" and "trade" as found in the Random House College Dictionary. There, "business" is defined as "the purchase and *sale* of goods in an attempt to *make a profit,* Random House College Dictionary at 183 (rev. ed. 1982), and "trade" is defined as "any occupation pursued as a *business* or *livelihood.*" Random House College Dictionary, *supra* at 1392. (Emphasis added.)

With specific application to the case at hand, sec. 1.61-4(d), Income Tax Regs., describes farmers as "individuals, partnerships, or corporations that cultivate, operate, or manage farms for *gain* or *profit.*" (Emphasis added.)

[5]In *Byrd,* we summarized and accepted the Commissioner's argument thusly:

"Respondent however contends that petitioners have lost sight of the fact that the deduction in the earlier year authorized by section 162 is premised on the fact that *an expense is necessary to produce income* in the ordinary course of one's business. Respondent asserts that *expenses incurred by nurserymen in growing plants* are deductible because *the plants will*

The majority's reliance on "the consumption of the asset" as the overriding justification for the granting of a section 162 deduction tied to the asset belies the longstanding premise which underlies this deduction. Such deduction's true raison d'etre rests not on the actual consumption of the asset which is expensed, but on the expensed asset's contribution to the generation of income by the trade or business. The act of producing income, the act of taking a product to market and risking the fortunes and pitfalls of competition justifies the deduction. In *Bliss Dairy*, the expensed feed distributed to the dairy's shareholders in no way contributed to the dairy's generation of income.[6] Similarly, in the case at hand, the expensed items in question have not had and will never have an effect on the generation of income by Schwartz Farms.

As a further comment, the majority's emphasis upon physical consumption of the exact item acquired through the expenditure is an exaltation of form over substance. Just because there has been a physical transformation of seed, fertilizer, water, etc. into an end product (whose value equals or exceeds the cost of production) is not a sound basis for disregarding the spirit of the tax-benefit rule. A requirement that the same physical items be distributed to shareholders is analogous to a requirement that there be an actual recovery of the items previously deducted. Such a requirement of sameness "would introduce an undesirable formalism into the application of the tax benefit rule."[7]

be sold to customers in the ordinary course of business. Therefore respondent concludes that since the plants were distributed to shareholders in liquidation this treatment was fundamentally inconsistent with the purpose behind the section 162 deduction. For the reasons set forth below, *we agree with respondent.* [*Byrd, Transferee v. Commissioner,* 87 T.C. 830, 836 (1986), affd. without published opinion 829 F.2d 1119 (4th Cir. 1987); emphasis added.]"

[6]No issue was raised in *Bliss Dairy* regarding the expensed feed that was consumed by the dairy herd prior to the corporate liquidation. The fact that the issue of consumed feed was not placed in issue in *Bliss Dairy* should be accorded little or no weight. See *Perkins v. Endicott Johnson Corp.,* 128 F.2d 208 (2d Cir. 1942), affd. 317 U.S. 501 (1943). Based upon the facts in the *Bliss Dairy* opinion, I doubt that the tax-benefit rule could have properly been applied to the feed already consumed by the dairy herd. The nature of a dairy operation suggests that the primary business is the production and sale of dairy products which are normally produced on a daily basis and sold immediately. Under those circumstances, the cost of consumed feed would properly offset income from the production and sale of dairy products. Deductibility of the consumed feed was not based upon any assumptions that were fundamentally inconsistent with the corporate liquidation.

[7]The majority's emphasis on the term "consumption" may well instigate before our Court and others a future parade of experts in biology, chemistry, and physics, as both the Commissioner and taxpayers attempt to sway our decision and those of other courts that a particular asset has been fully consumed.

*Hillsboro National Bank v. Commissioner,* 460 U.S. at 382.

I also note that the majority's holding fails to fully consider our decision in *Byrd, Transferee v. Commissioner, supra.* In *Byrd,* we required the taxpayers to recapture the deducted cost of young plants which were purchased for sale in the ordinary course of an S corporation's business but which were distributed as mature plants to the corporation's shareholders during a liquidation of the corporation.[8] In reaching this decision, we applied the tax-benefit rule and stated as follows:

the *cost of seeds* and young plants which are purchased for further development and cultivation prior to sale in later years may be deducted as an expense for the year of purchase, * * * If the purchased [and mature] plants are not sold in the ordinary course of the taxpayer's trade or business, but are instead converted to a nonbusiness use *which does not produce business income,* this action would be viewed as inconsistent with the prior deduction, and the tax benefit rule would require that *an amount equal to the unwarranted deduction be included in income.*

\* \* \* \* \* \* \*

[Taxpayers] deducted the cost of young plants purchased for sale in their business after the plants had grown to mature size. Instead of selling the plants in the ordinary course of their trade or business and *realizing income to offset the cost of production,* [taxpayers] distributed the plants to its shareholder in liquidation. It is clear that this treatment is "fundamentally inconsistent" with the purpose for which the deduction was taken. * * * [*Byrd, Transferee v. Commissioner,* 87 T.C. at 837-838; citation omitted; emphasis added.]

As this statement from *Byrd* makes clear, a taxpayer's liquidating distribution of its marketable products to its shareholders, in lieu of this taxpayer's sale of its products to generate income "to offset [its] cost of production," is "fundamentally inconsistent" with the purpose for which the production costs were deducted. This fundamental inconsistency justifies the tax-benefit rule's application.[9] In the case at hand, Schwartz Farms, by its action of

---

[8]The young plants in *Byrd* were inventoried on a yearly basis as if purchased by a cash basis taxpayer. *Byrd, Transferee v. Commissioner,* 87 T.C. at 831.

[9]As a general rule, this Court will not look behind a notice of deficiency to examine the evidence used or the propriety of the Commissioner's motives or administrative policy or procedure in making the determination. *Greenberg's Express, Inc. v. Commissioner,* 62 T.C. 324, 327 (1974); *Suarez v. Commissioner,* 58 T.C. 792, 813 (1972). Noting such, we should draw no conclusions from the Commissioner's failure in *Byrd* to subject further costs of production, other than inventory items, to the recapture of the tax-benefit rule. For a discussion of the tax-benefit rule's application in the context of an unforeseen event, see *infra.*

distributing mature crops to its shareholders, has failed to generate income through the sale of these crops to offset the costs of seed, fertilizer, water, etc. This liquidating distribution represents a fundamental inconsistency associated with the deducted costs and triggers the tax-benefit rule's application.

Moreover, the majority's holding fails to fully consider the decision in *Ballou Construction Co. v. United States,* 611 F. Supp. 375 (D. Kan. 1985).[10] In describing the "Sand Deposit in Place," the asset which Salina Sand distributed in liquidation, the U.S. District Court for the District of Kansas stated, "This asset represented a certain amount of *sand* which Salina Sand had processed through the first stage of mining, but which had *not* yet *produced income* in the normal course of business." *Ballou Construction Co. v. United States,* 611 F. Supp. at 376. That court then focused on the section 162(a) deduction which it recaptured under the tax-benefit rule. That recaptured deduction represented the $20,000 cost of removing the overburden from the sand deposit in place. *Ballou Construction Co. v. United States,* 611 F. Supp. at 376, 377, and 378. The removal of this overburden had enhanced the value of the distributed sand. *Ballou Construction Co. v. United States,* 611 F. Supp. at 376. Thus, the *Ballou* court had required the recapture under the tax-benefit rule of an expense which had enhanced the value of a product which was moving toward final form but which had not yet produced income for the deducting company. We should do likewise here.

For the sake of argument, I find that the majority is wrong when its focuses on the sand deposit in place as the asset in *Ballou* which must be "consumed" for purposes of section 162(a). First, the sand deposit in place represents Salina Sand's marketable product as this product moves through the different stages of production. As such, Salina Sand will never "consume" the sand found in the sand deposit in place. The company would instead complete the processing of this sand and sell the sand as a finished good in the normal course of its business.[11] Second, the sand

---

[10]We have cited *Ballou* approvingly and accepted its discussion of the transactional parity underlying the tax-benefit rule. See *Byrd, Transferee v. Commissioner,* 87 T.C. at 838.

[11]The sand deposit in place in *Ballou* is similar to a crop not yet fully matured and harvested. Both assets represent items that will not be consumed by their producers but

deposit in place was not the subject of the section 162(a) deduction in *Ballou.* The deduction in that case represented the costs of removing the overburden. This removal had been *completed* by the time of Salina Sand's liquidation. This completed removal represented a fully consummated act, a "consumption" or "using-up" of the actions, labor, and processes tied to the carrying of the marketable product in *Ballou* through the first stage of mining and processing. It was the costs of these "consumed" actions, labor, and processes which were recaptured in *Ballou.*

Though the majority was wrong in focusing on the sand deposit in place as the item subject to consumption, the majority was very correct when it said, "It is clear that the [*Ballou*] court simply applied the logic of the Supreme Court in *Bliss Dairy* to the facts before it on the assumption that the deducted costs were *directly attributable* to the sand deposit in place." (Emphasis added.) Likewise, the costs deducted by Schwartz Farms in the instant case are directly attributable to the crops which the farm distributed in liquidation. Following the lead of the *Ballou* court, we should similarly apply the tax-benefit rule to recapture these direct costs, these costs which enhanced the value of a marketable product which was not sold in the normal course of business.[12]

---

instead will be enhanced by further actions taken on the part of their producers. These enhancing actions will be the subject of sec. 162(a) deductions.

Accepting the above proposition and utilizing the logic of the majority, we should hold in this case that, since the enhanced but unsold asset, unharvested crops, has not been "consumed" by its producer, then the costs directly attributable to this unconsumed asset should be recaptured under the tax-benefit rule.

[12]The majority's statement that no authority has been offered to support respondent's position in this case is inaccurate. This inaccuracy is confirmed by the majority's attempt to cite and distinguish precedent which in actuality supports or in no way contradicts respondent's position. One example is the majority's citing of Rev. Rul. 85-186, *supra.* Regardless of the fact that this ruling simply represents the view of the Commissioner, I point out that the deductions involved in that ruling were taken under sec. 174(a). The purpose and function of sec. 174's granting of deductions may not be in tandem with those under sec. 162.

Additionally, respondent has maintained since at least 1955 a position quite analogous to that which he argues here. In Rev. Rul. 55-138, 1955-1 C.B. 223, 224-225, modified on another issue, Rev. Rul. 68-69, 1968-1 C.B. 80, respondent opined:

"This has been done on the assumption that such costs have been a part of the costs incurred in the business of the taxpayer. When the goods become the subject of a contribution or gift they are in effect removed from the business operations of the taxpayer and such costs attributable thereto should likewise be eliminated from business costs."

We have cited Rev. Rul. 55-138, *supra,* and accepted the consequences of the application of the above-mentioned language. See *Martin v. Commissioner,* 56 T.C. 1294, 1299 (1971).

The majority opines that "Under respondent's formulation, every business deduction under section 162 would be 'cancelled out' if an unforeseen event, not just a corporate liquidation, frustrated the sale of any products which would otherwise have been completed and sold." This is simply not the case. As the Supreme Court makes clear in *Bliss Dairy* when a "loss is attributable to the business," when the deducting trade or business accepts the risk of loss, then the tax-benefit rule's use is circumscribed. *Hillsboro National Bank v. Commissioner*, 460 U.S. at 384-385 and n. 18. Consequently, any unforeseen event does not inevitably result in the rule's recapture.

In the instant case, moreover, we are not faced with an unforeseen event. Schwartz Farms voluntarily decided to liquidate. In doing so, the liquidating farm chose not to subject its products to the risk of loss, whether that loss should occur in the market place or from an unforeseen event. It is in the context of this farm's voluntary action that we must consider respondent's argument and apply the tax-benefit rule.

At this point, I also find it necessary to respond to the majority's reliance on section 464 and the special accounting provisions applicable to farmers. The majority's decision to turn to section 464 to add meaning to the term "consume" would suggest that in the future we must similarly search high and low for talismanic words to define the term "consume" within the context of different trades or businesses prior to our applying the majority's rule. That this seems to be the logical result of the majority's analysis should elicit at least a statement of concern from the majority. Furthermore, the majority's use of section 464 as a statutory tool which stymies the proper application of the tax-benefit rule in this case leads to a suggestion that Congress has acted where it indeed has not. Congress did not restrict the tax-benefit rule's application under section 464; it instead established that rule's exclusionary element in section 111. We should not legislate where Congress has

---

Finally, we should draw no conclusions from the Commissioner's failure in those cases cited by the majority to assert as deficient amounts items of a character similar to those amounts in question in the instant case. See note 9 *supra*.

not by implying that Congress did act in wholly unrelated provisions applicable to *ongoing business operations.*

In responding to the majority's use of the special accounting provisions applicable to farmers as a means of not applying the tax-benefit rule in this case, I again find it instructive to turn to our decision in *Byrd.* There, we said:

[Section 352 of the Revenue Act of 1978[13]] did not change the nature of deductions available to nurserymen, or the purpose and function of such deductions. The changes made by act section 352 were changes in timing; *changes in accounting treatments.* Deductions taken by nurserymen and farmers are governed by section 162 which is the test for all deductions incurred by a taxpayer in a trade or business. We find the facts of *Bliss Dairy* similar to those in the instant case and view *Bliss Dairy* as controlling for our purposes. We must therefore examine the purpose and function of section 162 in light of petitioners' deductions to determine whether the distribution to Eastern Shore's shareholder in liquidation was "fundamentally inconsistent with the premise on which the deduction was initially based." [*Byrd, Transferee v. Commissioner,* 87 T.C. at 837; emphasis added.]

The unquestionable consequence of this language and our final ruling in *Byrd* is that we recaptured a cost of production which had not been recouped through a subsequent sale. We applied the tax-benefit rule, in spite of special accounting provisions and the *Byrd* producers' need not to accumulate inventories.[14]

---

[13]Sec. 352 of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2846-2847, provided as follows:

(a) APPLICATION OF SECTION.—This section shall apply to a taxpayer who—

(1) is a *farmer,* nurseryman, or florist,

(2) is on an accrual method of accounting, and

(3) is not required by section 447 of the Internal Revenue Code of 1954 to capitalize preproductive period expenses.

(b) TAXPAYER MAY NOT BE REQUIRED TO INVENTORY GROWING CROPS.—A taxpayer to whom this section applies may not be required to inventory growing crops for any taxable year beginning after December 31, 1977.

(c) Taxpayer May Elect To Change To Cash Method.[0001]T0—A taxpayer to whom this section applies may, for any taxable year beginning after December 31, 1977 and before January 1, 1981, change to the cash receipts and disbursements method of accounting with respect to any trade or business in which the principal activity is growing crops.

(d) SECTION 481 OF CODE TO APPLY.—Any change in the way in which a taxpayer accounts for the costs of growing crops resulting from the application of subsection (b) or (c)—

(1) shall not require the consent of the Secretary of the Treasury or his delegate, and

(2) shall be treated, for purposes of section 481 of the Internal Revenue Code of 1954 as a change in the method of accounting initiated by the taxpayer.

(e) GROWING CROPS.—For purposes of this section, the term "growing crops" does not include trees grown for lumber, pulp, or other nonlife purposes.

[Emphasis added.]

[14]Our action in *Byrd* supports the notion that accounting rules do not necessarily prevail over general principles of tax economics and substance. Cf. *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522 (1979).

As a further comment, I find it necessary to ask just what rule the majority is espousing in this case. To the extent the majority so heavily relies on section 464 and the special accounting provisions applicable to farmers in deciding not to apply the tax-benefit rule, is it suggesting that its holding in this case has reference only to "farmers"? The majority's citing of cases which do not involve farmers, i.e., *Tennessee Carolina Transportation v. Commissioner*, 65 T.C. 440 (1975), affd. 582 F.2d 378 (6th Cir. 1978); *Estate of Munter v. Commissioner*, 63 T.C. 663 (1975), would hint that this is not its intent. However, the majority, through its analysis, has not forthrightly established a rule of general applicability.

The majority notes in note 4 of its opinion that the parties to this case have made no suggestion that section 268 is applicable in this instance. However, it is interesting to note the application of this section and its related section 1231(b)(4).[15] If section 1231 applies, then a farmer, under the direction of section 268, must recapture deductions, in the form of "expenses, depreciation, or otherwise," which are attributable to the production of the unharvested crop. These recaptured deductions include those taken in a taxable year other than the year of sale. In applying the tax-benefit rule to the case at hand, I would require of Schwartz Farms no greater burden of tracing and recaptur-

---

Moreover, in an instance tied to farmers/sharecrop landlords, we have described a special accounting procedure as "a rule of administrative convenience" but have gone on to state that this rule has "no bearing on the underlying question whether potentially taxable income exists." *Parmer v. Commissioner*, T. C. Memo. 1971-320, citing *Tatum v. Commissioner*, 400 F.2d 242, 247 (5th Cir. 1968), affg. 46 T.C. 736 (1966). This language would consequently imply that questions of income realization may be addressed irrespective of special accounting rules.

[15]Sec. 268 provides:

Where an unharvested crop sold by the taxpayer is considered under the provisions of section 1231 as "property used in the trade or business," in computing taxable income no deduction (whether or not for the taxable year of the sale and whether for expenses, depreciation, or otherwise) attributable to the production of such crop shall be allowed.

Sec. 1231(b)(4) states:

(4) UNHARVESTED CROP.—In the case of an unharvested crop on land used in the trade or business and held for more than 6 months, if the crop and the land are sold or exchanged (or compulsorily or involuntarily converted) at the same time and to the same person, the crop shall be considered as "property used in the trade or business." [The above language reflects this section as it appeared in 1975. Changes in the holding period were made for tax years 1977 and 1978.]

ing of expenses than that required by Congress under section 268.

I also find it odd that the majority couches its discussion of *Spitalny v. United States,* 430 F.2d 195 (9th Cir. 1970), within the rubric of *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In *Consolidated Foods Corp. v. Commissioner,* 66 T.C. 436 (1976), we directly cited *Spitalny,* and the rule for which the majority relies on it, without having to additionally cite *Golsen.*[16] That the majority now finds it necessary to cite *Golsen* in our applying *Spitalny* seems to detract from the precedential authority of our own opinion.

In sum, the principle laid down by the Supreme Court in *Bliss Dairy* focuses on *transactional parity,* which strives to achieve the *matching of income and expense,* and the tax-benefit rule is triggered by a fundamentally *inconsistent event* that *distorts* this matching of income and expense. Thus, the tax-benefit rule applies, without regard to recovery, to fundamentally inconsistent events that distort the matching of income and expense.[17]

Correlatively, section 162 permits deductions for expenses of a *business* that are incurred in the quest to produce

---

[16]There we said:

"Although the [tax-benefit] rule is generally addressed to situations in which a deduction in an earlier taxable year is related to a recovery in a later taxable year, the same approach has been applied where both deduction and offsetting recovery occur in the same taxable year. See *Connery v. United States,* 460 F.2d 1130, 1133 (3d Cir. 1972); *Spitalny v. United States,* 430 F.2d 195, 198 (9th Cir. 1970); *Anders v. United States,* 462 F.2d 1147, 1149 (Ct. Cl. 1972), cert. denied 409 U.S. 1064 (1972), rehearing denied 410 U.S. 947 (1973); *Estate of David B. Munter, [v. Commissioner,* 63 T.C. 663, 674-677 (1975)]. Here, accrued liabilities were satisfied during the same taxable years by crediting surplus bond proceeds against such liabilities—indeed, the liabilities arose and the funds were credited on the same days—and the tax benefit rule should be applied. * * * [*Consolidated Foods Corp. v. Commissioner,* 66 T.C. 436, 445 (1976).]"

Moreover, the Supreme Court has cited approvingly the cases listed in the above quotation. See *Hillsboro National Bank v. Commissioner,* 460 U.S. at 396 and 402. *Spitalny* was specifically cited as standing for the proposition that "when deduction and liquidation occur within a single year, though tax benefit rule does not apply, principle does." *Hillsboro National Bank v. Commissioner,* 460 U.S. at 401.

[17]The Supreme Court has mentioned that a rancher, a taxpayer similar to a farmer, who uses the cash method possesses substantial flexibility in determining the year in which income is realized. However, the defect of this method is that it produces a bunching of income in the year of sale and "an inaccurate *matching of income* from the sale of the livestock *with the expenses* incurred in raising the animals." *United States v. Catto,* 384 U.S. 102, 111 n. 15 (1966). (Emphasis added.) To the extent the tax-benefit rule requires a matching of income and associated expense, the rule would override the cash method's defect.

income. Simply put, the Supreme Court said in *Bliss Dairy* that deductions should be allowed under section 162 only for those expenses attributable to the business that are directly incurred in connection with the income of the business.

Applying these elemental principles to the case before us, it is clear that the fundamentally inconsistent event of liquidation obviated the correlation of crop production expense to the generation of income from the crop. This distortion compels application of the tax-benefit rule in the instant case, as it did in *Bliss Dairy*.

Because the majority opinion implicitly overrules *Byrd*, perceptibly discriminates in not applying the tax benefit rule to a large, affluent farming operation, and seriously erodes the rule's application in other areas, and for the reasons above set forth, I respectfully dissent.

CHABOT, NIMS, PARKER, JACOBS, PARR, and RUWE, *JJ.*, agree with this dissent.

———

RUWE, *J.*, dissenting: I agree with and join the dissenting opinions of Judges Nims and Hamblen and write this to add two brief observations.

The majority opinion appears to acknowledge that tax-benefit rule principles apply even though the expenditures and liquidation occurred in the same taxable year. In note 8, the majority concedes that the Supreme Court in *Bliss Dairy* found it of no consequence whether the application of these principles takes place by way of reducing or eliminating a deduction or increasing income. In light of this, I believe that the majority places unwarranted reliance upon section 464 and its allowance of deductions for items "used or consumed." Deductions allowed by section 464 are restricted to deductions "otherwise allowable under this chapter." Since the tax-benefit rule and its effect of canceling out deductions was in effect at the time section 464 was enacted, the first question is whether tax-benefit rule principles effectively precluded deductibility aside from anything contained in section 464. Section 464 itself is irrelevant to this inquiry.

The majority notes that neither party suggested the applicability of section 268. I feel that section 268 should be mentioned, however, because adoption of the majority opinion will cause different results depending upon whether the tax results of a liquidation are governed by section 336 or section 337. Section 268 provides that no deduction shall be allowed which is attributable to the production of crops which have been sold with the land and afforded capital gains treatment. The purpose of section 268 is to disallow deductions when they are inconsistent with a later event, i.e., ordinary income property (unharvested crops) being converted to section 1231 property which is capable of producing capital gain.[1] See S. Rept. 781, 82d Cong., 1st Sess. 47-48 (1951). Section 268 would appear to be a partial codification of tax-benefit rule principles.

The unharvested crops in the instant case were disposed of at the same time as the land, and would have qualified as section 1231 property if a recognizable sale or exchange had occurred.

In *Beauchamp & Brown Groves Co. v. Commissioner,* 44 T.C. 117 (1965), affd. 371 F.2d 942 (9th Cir. 1967), we held that a liquidation under the provisions of section 337 triggers the operation of section 268, thereby disallowing deductions attributable to the production of an unharvested crop that is sold with the land. The fact that there was no recognizable gain which could be characterized by section 1231 did not prevent the application of section 268. In *Teget v. United States,* 407 F. Supp. 681 (D. S.D. 1976), revd. and remanded on another issue 552 F.2d 236 (8th Cir. 1977), the District Court construed section 268 and held that a mail order seed and nursery company which sold its land and unharvested crop was not entitled to a deduction for the cost of an unharvested crop, although no gains were

---

[1]Sec. 268 provides:

Where an unharvested crop sold by the taxpayer is considered under the provisions of section 1231 as "property used in the trade or business," in computing taxable income no deduction (whether or not for the taxable year of the sale and whether for expenses, depreciation, or otherwise) attributable to the production of such crop shall be allowed.

Sec. 1231(b)(4) provides:

(4) UNHARVESTED CROP.—In the case of an unharvested crop on the land used in the trade or business and held for more than 6 months, if the crop and the land are sold or exchanged (or compulsorily or involuntarily converted) at the same time and to the same person, the crop shall be considered as "property used in the trade or business."

in fact recognized in the section 337 12-month complete liquidation.

The majority opinion states that the corporation adopted its plan of liquidation under section 337. Had it followed through and sold the land and unharvested crops together, section 268 would have applied. It appears, however, that section 336 controls the tax consequences of the liquidation that actually took place.

Application of tax-benefit rule principles to a section 336 liquidation produces the same result with respect to the unharvested crops that section 268 produces in a section 337 liquidation. The majority opinion, however, produces diametrically opposite results depending upon whether the tax consequences of the liquidation are controlled by section 336 or section 337. Given the Supreme Court's finding that "The very purpose of section 337 was to create the same consequences as section 336" (*Hillsboro National Bank v. Commissioner*, and *United States v. Bliss Dairy, Inc.*, 460 U.S. 370, 401 (1983)), we should decide this case in a manner that results in the consistency advocated by the Supreme Court.

CHABOT, PARKER, JACOBS, and PARR, *JJ.*, agree with this dissent.